# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JOHN M. STEPHENSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CAUSE NO. 3:07-CV-539-TS |
| v. | ) | |
| | ) | |
| MARK LEVENHAGEN, | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

John M. Stephenson, by counsel, filed a Petition for a Writ of Habeas Corpus in a Capital

Case pursuant to 28 U.S.C. § 2254 seeking relief from a state court criminal proceeding in which

he was sentenced to death. In the interests of both fiscal and judicial economy, the petitioner

filed a Motion for Summary Judgment on Claim I of Petition for Writ of Habeas Corpus [DE 39]

asking the Court to resolve this case solely on his first ground for relief. The summary judgment

motion has been fully briefed and oral argument was held in Fort Wayne, Indiana, on March 5,

2009. For the reasons explained in this Opinion, the Motion for Summary Judgment is

**GRANTED** and the Great Writ is conditionally **GRANTED** on Ground 1. The State of Indiana

is free to re-try John M. Stephenson, providing that it files appropriate documents in the State

Trial Court seeking such relief within 120 days of this Order.


## SEPARATE REVIEW OF GROUND ONE

The Petitioner filed a Motion for Summary Judgment pursuant to Federal Rule of Civil

Procedure 56, asking the Court to separately review his first ground for seeking habeas corpus

relief. The intersection between the Federal Rules of Civil Procedure and the Rules Governing

Section 2254 Cases in the United States District Courts is not well defined. "[T]he applicability

of the civil rules to habeas corpus actions has been limited, although the various courts which have considered this problem have had difficulty in setting out the boundaries of this limitation." Advisory Committee Note on Rule 11 of the Rules Governing Section 2254 Cases. Nevertheless, the general parameters are clear. Federal Rule of Civil Procedure 81(a)(4) provides that, "These rules apply to proceedings for habeas corpus . . . to the extent that the practice in those proceedings: (A) is not specified in a federal statute [or] the Rules Governing Section 2254 Cases . . .; and (B) has previously conformed to the practice in civil actions." Rule 11 of the Rules Governing Section 2254 Cases provides that, "The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."

Here, the Petitioner has chosen to utilize Rule 56 as a vehicle to request that the Court address a single ground in his Petition without awaiting the filing of a traverse on his other issues. While the precise applicability of Rule 56 is debated by the parties, the Court has "an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962). Furthermore, Federal Rule of Civil Procedure 42(b) provides that "to expedite and economize, the court may order a separate trial of one or more separate issues [or] claims . . .." Therefore, it is unnecessary to resolve the precise applicability of Rule 56 because the court has the authority to individually resolve the first ground separate from the Petitioner's other claims.

When making a determination to separately consider a single ground, the objective is to achieve the just, expeditious, and economical resolution of the case. Certainly, it is always

possible that what initially appeared to be an efficient procedure will ultimately prove to be otherwise. The Respondent is correct that if the court denied habeas corpus on the first ground, bifurcation would be neither more expeditious, nor more economical. But it is equally true that if the resolution of the case were delayed until after all of the issues were fully briefed, and habeas corpus were then granted on the first ground, that would be a slower, more expensive procedure. Here, the Court has balanced the possible downside risk of delay and extra briefing against the opportunity for a prompt result without the additional costs associated with preparing and arguing additional, unnecessary issues. Each time the court evaluated these competing factors (during the telephonic conference; in response to the respondent's motion for clarification; in response to the motion to enlarge the deadline for filing the traverse; and finally when the motion was set for oral argument) more information became available, but the conclusion remained the same. Separate consideration of the Petitioner's first ground has not only the potential for an efficient resolution, but also the advantage of permitting the parties and the Court the opportunity to focus exclusively on the Petitioner's lead, and presumably strongest, argument for habeas corpus relief.

## FACTUAL AND PROCEDURAL BACKGROUND

There are two published opinions by the Supreme Court of Indiana related to this case: *Stephenson v. State*, 742 N.E. 2d 463 (Ind. 2001) (*Stephenson I*), and *Stephenson v. State*, 864 N.E. 2d 1022 (Ind. 2007) (*Stephenson II*). In its opinion denying his direct appeal, the Indiana Supreme Court laid out the facts and prior history of the case.

In the early evening on March 28, 1996, Defendant John Matthew Stephenson and his friend, Dale Funk, drove around Warrick County. The two ended up at the

residence of Brian Mossberger, a friend of the Defendant and an acquaintance of Funk. While there, Defendant and Funk shot off rounds of firearms with Defendant shooting his own SKS assault rifle. Defendant and Funk left to go target shooting at a railroad crossing on Red Brush Road located near Mossberger's home. Afterwards, Defendant, who was still accompanied by Funk, drove to the mobile home of Brandy Southward and her fiancé, Troy Napier. According to Funk's testimony, they both got out of the car and walked around the mobile home. Defendant yelled for someone but after no one answered, Funk returned to the car and Defendant proceeded toward the mobile home. A few moments later, Funk observed Defendant walk out the front door carrying a splitting maul.

Defendant and Funk returned to Mossberger's house. Shortly thereafter, a pick-up truck briefly pulled into Mossberger's driveway. John "Jay" Tyler was the driver of the truck and his wife, Kathy Tyler, and friend Brandy Southard were the passengers. Mossberger testified that Defendant said, "There goes Jay and I've got to catch him." (R. at 24,669.) Funk testified that Defendant said, "If you're coming, come on." (R. at 23,969.)

The evidence as to what happened next comes solely from Funk's testimony at trial. Funk testified that Defendant began chasing the Tyler truck through Warrick County rural roads. The Tyler truck stopped at the intersection of Eble and Youngblood roads and Defendant also stopped his car. The driver-side door of the truck opened slightly, and Jay leaned out of the truck to look at Defendant. At that point, Defendant grabbed his SKS assault rifle, exited the car, and began firing several shots at the Tyler truck. Defendant got back into the car, drove around a corner, stopped his car and got out. Defendant walked towards the Tyler truck and returned a few minutes later. Defendant threatened Funk stating, "You breathe a word of this and I'll kill you." (R. at 23,980-80.)

Defendant and Funk then drove directly back to Mossberger's house. Mossberger testified that Defendant held a knife with "red smears" on the blade, by his (Defendant's) face and said, "Jay, Kathy, and Brandy are no more." (R. at 24,674-75.) Mossberger also testified that Defendant washed his knife in the kitchen sink and that Defendant instructed him to "do something with the SKS; get rid of it; make it gone." (R. at 24,678.) Funk offered similar testimony, stating that he observed Defendant "hand[] the gun to [Mossberger]; told him to get rid of it." (R. at 23,982.) The next day, Mossberger buried the SKS assault rifle and ammunition in the woods.

Early Friday morning, March 29, police officers discovered the Tyler truck. Inside the truck, the police officers found victims John "Jay" Tyler, Kathy Tyler, and Brandy Southard dead from gunshot and stab wounds. The police officers also discovered bullet holes in the truck and found spent shell casings scattered across the width of Youngblood Road. Forensic testing revealed that the fatal bullets matched those fired from the SKS assault rifle belonging to Defendant. The spent shell casings matched the ammunition discovered in Southard and Napier's mobile home. Other testing revealed Funk's shoe prints

were at the mobile home, directly below the broken window. Although the knife used in the killings was not recovered, Defendant owned a similar knife that could have caused the victims' injuries. On that Friday night, Defendant contacted police about the murders and gave a written statement indicating that Brandy Southard had received a threat from one Jimmy Knight.

On Saturday, March 30, while at home, Defendant voluntarily gave a taped statement to Officers Michael Hildebrand and Gary Gilbert and consented to a police search. In his taped statement, Defendant admitted to having seen and talked to the victims on March 28th at around 9:30 or 10:00 p.m. at a local Circle S store. Defendant also stated that afterwards, he went to Mossberger's house and then went straight home.

On Sunday, March 31, Mossberger retrieved the SKS assault rifle and ammunition, placing the SKS in the house and the ammunition in his garage. Police officers arrived at Mossberger's house to question him, and he explained the events that occurred on the day of the killings. Mossberger also showed the officers the SKS assault rifle, but not the ammunition. The same day, Mossberger directed the officers to Funk's apartment in Hatfield. Police officers questioned both Mossberger and Funk and took Funk into custody for further questioning at the Warrick County Security Center. Funk was released on or about April 1. On April 3, 1996, Defendant surrendered himself to the Owensboro Police Department.

The State charged Defendant with Burglary, Theft, and three counts of Murder of each of Jay Tyler, Kathy Tyler, and Brandy Southard. The State also sought the death penalty, alleging as aggravating circumstances that Defendant intentionally discharged a firearm from a vehicle, committed at least one of the murders by lying in wait, and committed multiple murders.

The trial commenced on September 23, 1996. On May 8, 1997, after deliberating for approximately three hours, the jury found Defendant guilty of Burglary, Theft, and all three counts of Murder. On May 19, 1997, the trial court conducted the penalty phase and the jury recommended that the death penalty be imposed based upon the multiple murder aggravator. The trial court held a sentencing hearing on June 16, 1997. The trial court followed the jury's recommendation and sentenced Defendant to death.

*Stephenson I* at 470–72 (Ind. 2001) (brackets in original, footnotes omitted). Stephenson then

sought and was denied a Writ of Certiorari to the United States Supreme Court. *Stephenson v.*

*Indiana*, 534 U.S. 1105 (2002).

Following the conclusion of his direct appeal, Stephenson, by appointed counsel, filed a

petition for post-conviction relief. Appendix to Brief of Petitioner-Appellant at 144–58,

*Stephenson v. State*, 87S00-0106-PD-285. That petition was denied, and he appealed to the Supreme Court of Indiana. In its opinion affirming that denial, the Indiana Supreme Court reviewed and analyzed the ineffective assistance of counsel claim which is the subject of this opinion. After his petition for rehearing was denied by the Indiana Supreme Court, he sought and was denied a Writ of Certiorari to the United States Supreme Court. *Stephenson v. Indiana*, 128 S. Ct. 1871 (2008). He then initiated this habeas corpus proceeding.

## STANDARD OF REVIEW

### A. Habeas Corpus Proceedings

In a Habeas Corpus proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner is able to rebut that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In evaluating a legal determination made by a State court,

> AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

*Brown v. Payton*, 544 U.S. 133, 141 (2005) (citations omitted).

> For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by this Court refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision. We look for the governing legal

principle or principles set forth by the Supreme Court at the time the state court renders its decision.

*Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (quotation marks and citations omitted).

Furthermore, the United States Supreme Court has made clear that it is not for this Court to independently decide the merits of the Petitioner's legal arguments.

As we have explained, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a [United States] Supreme Court case incorrectly. Rather it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.

*Price v. Vincent*, 538 U.S. 634, 641 (2003) (quotation marks, citations and brackets omitted).

## B.      Ineffective Assistance of Counsel

In addressing an ineffective assistance of counsel claim,

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. To establish prejudice, the petitioner, "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at

694. "[T]he question is whether there is a reasonable probability that, absent the errors, the

factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

> A number of practical considerations are important for the application of the standards we have outlined. Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id.* at 695–96 (part number omitted).


## DISCUSSION

## GROUND 1—INEFFECTIVE ASSISTANCE OF COUNSEL—STUN BELT

The Petitioner argues that, "Stephenson's trial counsel was ineffective for failing to

object when, without justification, Stephenson was forced to appear before the jury wearing a

stun belt for the duration of his capital trial." (Petition 16, DE 19.) The Respondent argues that,

"Stephenson has failed to show the Indiana Supreme Court's holding that Stephenson received

the effective assistance of counsel was contrary to or an unreasonable application of federal law." (Return 8, DE 29.) On appeal from the denial of his post-conviction relief petition, the Supreme Court of Indiana extensively addressed the argument that his trial counsel were ineffective for not objecting to his having to wear a stun belt. *Stephenson II* at 1030–41.

**A.      Indiana Supreme Court Decision—Deficient Performance**

The Indiana Supreme Court "conclude[d] that Stephenson's counsel's failure to object to the belt [met] the first prong of *Strickland*." *Id.* at 1035 (stating that "prevailing norms at the time of Stephenson's trial required counsel to object to visible restraints where there is no evidence suggesting escape, violence, or disruptive behavior"). That is, "that counsel's performance was deficient . . . [because] counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* at 687. The Respondent agrees that the first prong of *Strickland* has been established.

> The Indiana Supreme Court found Stephenson's trial counsel's performance to be deficient because the record did not establish any justification or explanation for counsel's failure to object to the use of the stun belt that was "readily visible" and therefore failed to meet prevailing professional norms.

(Return 10, DE 29.) Because there is no dispute in this case that counsel's performance was deficient, the sole question before this court is whether it was clearly erroneous for the Indiana Supreme Court to have found that Stephenson was not prejudiced by this deficient performance.

**B.      Indiana Supreme Court Decision–Prejudice**

The Supreme Court of Indiana found that "Stephenson has shown no prejudice because he has not shown a reasonable probability that an objection, if made, would have been successful

in the trial court, or would have produced the basis for a successful appeal." *Stephenson II* at

1040. This holding was both clearly erroneous and an incorrect statement of the test for

prejudice.

It is clearly erroneous because if counsel had objected, there was no legitimate basis for

requiring Stephenson to wear a stun belt. Furthermore, if, over objection, he had been required to

do so, the Indiana Supreme Court would have had to reverse his conviction on direct appeal. It is

an incorrect statement of the test for prejudice because the question is not whether the objection

would have been sustained or resulted in a reversal on direct appeal.

1.      *No Articulation of a Legitimate Basis for Requiring Stun Belt*

There was no legitimate basis for requiring Stephenson to wear a stun belt at his trial in

1996-97. In *Wrinkles v. Buss*, 537 F.3d 804 (7th Cir. 2008), the Seventh Circuit explained the

relevant Supreme Court law on the use of stun belts as it existed at that time. Citing *Illinois v.

Allen*, 397 U.S. 337 (1970), *Estelle v. Williams*, 425 U.S. 501 (1976), and *Holbrook v. Flynn*,

475 U.S. 560 (1986), the Seventh Circuit explained that, "it was well established that a trial court

could not restrain a criminal defendant absent a particularized justification . . . [and] these cases

make clear that particularized reasoning must support any decision to restrain a defendant."

*Wrinkles* at 814.

The Respondent objects that the *Wrinkles* decision "is not clearly established Supreme

Court precedent nor is it on all fours factually and legally with Stephenson's case." (DE 44 at 6.)

Though it is self-evident that the Seventh Circuit is not the Supreme Court, this Court is

nevertheless bound by the Seventh Circuit's interpretations of United States Supreme Court

cases. *Wrinkles* unambiguously holds that at the time of Stephenson's trial in 1996-97, *Allen*, *Estelle*, and *Holbrook* were clearly established law prohibiting the use of stun belts without particularized reasoning. Here, it is undisputed that no particularized determination was made by the State trial court.

During oral argument, it was agreed by all parties that the critical portion of the *Stephenson II* opinion appears at pages 1040–41 where the Indiana Supreme Court found that the facts of this case would have supported a particularized determination if one had been made.

> These three murders were contended by both the defendant and the prosecution to have been related to organized drug activity. The murders appeared to have been premeditated and had characteristics of an assassination. There was testimony that the defendant had threatened to kill a critical witness. Under all these circumstances, the post-conviction court's finding is not clearly erroneous. Indeed, given the state of the law in 1996, we think it plain that the trial judge would have followed the sheriff's recommendation and ordered that the belt be deployed at the guilt phase even if defendant's counsel had objected and required a hearing and findings as to the need for its use.

*Stephenson II* at 1040–41.

This factual finding is clearly erroneous because the Indiana Supreme Court determined that there was no evidence in the record to support a finding that the Sheriff recommended to the trial judge that Stephenson wear a stun belt at trial.

> The sheriff, in turn, cited concerns in transporting defendants from jail to the courtroom as the basis for requiring restraint. These concerns did not seem to relate directly to use of the belt at trial as opposed to its use in transit, but that issue was not explored at the post-conviction hearing. n4 The officers in charge of security at the trial testified that they had no knowledge of any incidents that would demonstrate a need for Stephenson to wear a stun belt. Sheriff Bruce Hargrave; Charlie McCracken, the sergeant in charge of security at Stephenson's trial; Jerry Ash, the deputy of security; police officer Robert Irvin; and Jonetta Baker, jail commander for the Warrick County Police Department, all testified at post-conviction that to their knowledge Stephenson posed no security threat and had exhibited no behavior that would demonstrate a specific need for a restraining device at trial. There was also extensive post-conviction testimony from the

sheriff's office and others that Stephenson conducted himself as a "gentleman" throughout the arrest and trial. He had turned himself in in response to reports that law enforcement was looking for him in connection with the murders and made no effort to escape either before or during trial. From the sheriff's testimony, it appears that no one gave careful consideration to the need for any restraint while Stephenson was in the courtroom at his trial. Rather, the need was assumed, and the only concern voiced by the sheriff was whether the jury would see the restraint. Although the record shows that the trial judge followed the recommendation of the sheriff, it does not indicate that either had an inflexible policy of requiring restraint, or, if so, to what cases it applied.

*Stephenson II* at 1036–37 (omitted footnote quoted *infra*).

> At the post-conviction hearing, Sheriff Hargrove testified as follows:
>> Q: How was the decision made that John was going to wear this belt?
>> A: We just knew that he had to get him in and out of the building without the jury seeing him in shackles or handcuffs and we elected to--it was fairly, in our opinion at the time, it may not have been the new technology, but it was something that had just come to our attention, and we decided we were going to utilize the belt for that reason.
>> Q: When you--just so I'm sure--I know when you say "we" and "it was our decision," you mean you and who else?
>> A: The chief deputies
>> Q: The chief deputies. You didn't consult with the judge?
>> A: Well I, I don't know whether--I don't recall specifically speaking to the judge, and I may have. But I know that we'd over the years, we'd had a lot of discussions with Judge Campbell regarding the -- getting the inmates in and out of the jail without the, without the jury seeing them shackled or handcuffed.

*Stephenson II* at 1036 n.4. Additionally, the Indiana Supreme Court also stated in *Stephenson II*

that,

> The trial record makes no reference to the belt or to the need for restraint. There is no clear statement of the trial court's policy requiring restraint. There is no evidence that Stephenson was obstreperous or disruptive. In short, the record shows nothing to support an individualized determination that Stephenson required any form of restraint at trial, and there is no explanation in the trial record for use of the stun belt or any other restraint. The belt was not mentioned by the parties or the court in Stephenson's direct appeal.

*Id.* at 1031.

The remaining facts advanced by the Indiana Supreme Court for restraining Stephenson are not based on a particularized determination of the risks posed by Stephenson, but rather relate solely to the nature of the alleged offense. These three murders were alleged to have been premeditated, assassination style killings in connection with organized drug activity. In addition, the uncorroborated testimony of the sole eye witness to the murders themselves testified that immediately after the murders he was told, "You breathe a word of this and I'll kill you." *Stephenson II* at 1039 n.6. Although under the described circumstances, this is certainly a credible threat, it is nevertheless part and parcel of the crime itself.[1] Capital murder cases, by nature, are monstrous crimes. If the heinousness of the crime were the basis for making restraint decisions, then all capital murder defendants could lawfully be restrained. Such is not a particularized determination "specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986). Thus, it was clearly erroneous for the Indiana Supreme Court to have found that there was evidence to support an individualized determination that Stephenson needed to wear a stun belt.

So too, because "Stephenson posed no security threat and had exhibited no behavior that would demonstrate a specific need for a restraining device at trial" (*Stephenson II* at 1036), it was clearly erroneous for the Indiana Supreme Court to have found that the trial court would have overruled an objection to the stun belt.[2] Given the fact that neither the Sheriff nor any of the

_____

[1] As the Petitioner argued during oral argument, this is unlike an accused who is recorded threatening a witness while he is incarcerated.

[2] The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual

security staff made (nor had any reason to make) a recommendation that Stephenson should wear a stun belt at trial, the Indiana Supreme Court's determination that an objection to the stun belt would have been overruled by the State trial court in deference to the security concerns of the Sheriff is without any factual basis. As such, the Petitioner has met his burden of rebutting the presumption of correctness attached to that determination as required by 28 U.S.C. § 2254(e)(1).

Moreover, the Indiana Supreme Court would have had to reverse Stephenson's conviction on direct appeal if, over objection, he had been required to wear a stun belt without a factual basis for a particularized determination. Indeed, *Stephenson II* nearly acknowledges as much when it states,

> If the issue of shackling at the guilt phase had been preserved at trial and raised on direct appeal, we would have been compelled to address that claim under the standard of *Chapman v. California*, 386 U.S. 18 (1967), and the burden would have been on the State to establish lack of prejudice beyond a reasonable doubt.

*Stephenson II* at 1038 (parallel citations omitted). The court did not go on to conduct a *Chapman* analysis. Had it done so, it would have been an unreasonable application of *Chapman* for the Indiana Supreme Court to have found that the State of Indiana had established a lack of prejudice beyond a reasonable doubt because (as explained later in this Opinion) Stephenson has demonstrated prejudice. Therefore, it was clearly erroneous for the Indiana Supreme Court to have found that it would have affirmed the overruling of an objection to wearing the stun belt.

---

propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination. *Strickland* at 695.

2.      *The Seventh Circuit's Decision in* **Wrinkles v. Buss**

The Seventh Circuit recently decided a case that presented, on collateral review, the

question whether the defendant was denied effective assistance of counsel when his counsel

failed to object to the imposition of a stun-belt restraint during his criminal trial. *See Wrinkles v.*

*Buss*, 537 F.3d 804, 823 (7th Cir. 2008). The Respondent does not like the Seventh Circuit's

*Wrinkles* opinion and it is no wonder since it is so clearly and strongly counter to the State's

position in this case. Indeed, *Wrinkles* is both relevant and interesting. Relevant because it

presents a framework for analyzing this case as well as explaining the status of the clearly

established United States Supreme Court law related to stun belts at the time of Stephenson's

trial in 1996–97. Interesting because it is unusual to have two cases which so extensively discuss

each other and the interrelationships between the two as one followed the other through the State

and federal judicial systems.

Although *Wrinkles* is not alone in presenting a roadmap for reviewing ineffective

assistance of counsel claims, certainly it is that. Despite including a dissent, the three judges in

*Wrinkles* were in full agreement that *Strickland* required a showing of both deficient

performance and prejudice.

> I agree with my colleagues that Matthew Wrinkles's trial attorneys were
> deficient in failing to object to the trial court's insistence on the use of restraints
> absent judicial findings that Wrinkles presented a security threat or otherwise
> required physical restraints. I cannot agree, however, that Wrinkles was not
> prejudiced by counsels' error.

*Wrinkles*, 537 F.3d at 823 (Rovner J., dissenting). So too, the three judges in *Wrinkles* were in

full agreement that *Illinois v. Allen*, 397 U.S. 337 (1970), and *Holbrook v. Flynn*, 475 U.S. 560

(1986), constituted the clearly established law of the United States Supreme Court governing the use of stun belts. *See Wrinkles*, 537 F.3d at 814, 828, 830. Further, they were in agreement that counsel's performance was deficient for not objecting to the use of the stun belt and that the Indiana Supreme Court was clearly erroneous to have not so found.

It is unusual for two lines of cases (in this case *Stephenson* and *Wrinkles*) to be intertwined in their discussions of each other, but the fact that they have provides insight into both cases. Of particular note for this proceeding: *Stephenson II* discusses the Indiana Supreme Court's review of the denial of Matthew Wrinkles' post-conviction relief petition and the Seventh Circuit discusses *Stephenson II* in its review of the denial of Matthew Wrinkles' habeas corpus petition. In contrasting Stephenson's case with that of Matthew Wrinkles, the Indiana Supreme Court explained that,

> In Wrinkles's case, the penalty, not guilt or innocence, was the only real issue.
> The decision to challenge the belt arguably fell into the tactical range, balancing
> the likelihood of success against the risk of alienating the judge by challenging an
> announced "policy." In Stephenson's case, unlike Wrinkles, guilt was vigorously
> disputed, so that justification for counsel's omission is weakened, and in any
> event no such tactical consideration was advanced by counsel in post-conviction.

*Stephenson II* at 1032. This passage recognizes that the case against Matthew Wrinkles was much stronger that the one against Christopher Stephenson. This distinction is important to the determination of whether Stephenson was prejudiced by his counsel's failure to object to the use of the stun belt when Wrinkles was not.

Furthermore, in addition to other references, the Indiana Supreme Court devoted an entire subsection of *Stephenson II* to Matthew Wrinkles's post-conviction appeal.

> b. *Wrinkles v. State*
> Wrinkles, like Stephenson, asserted that trial counsel were ineffective for
> not objecting to the court's ordering him to wear a stun belt at trial. Wrinkles

contended that there was no reason to require restraint. We recognized that a defendant has the right to appear before a jury unrestrained unless restraint is necessary for a trial without incident. We also acknowledged that this right springs from the basic principle of American jurisprudence that a person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt and that in order for the presumption to be effective, a defendant must appear unrestrained to avoid the appearance that guilt was a foregone conclusion. We reiterated that the reasons for requiring a defendant to be restrained before a jury must be placed on the trial record. *Deck* [*v. Missouri*, 544 U.S. 622 (2005)] has now made clear that the Fourteenth Amendment imposes the same requirement. The majority in *Wrinkles* acknowledged that a policy requiring all defendants to wear restraints would not likely withstand appellate scrutiny if the issue were presented. We nonetheless held in *Wrinkles* that counsel's failure to object to the stun belt's use did not constitute ineffective assistance in that case. We based that ruling on a lack of prejudice, without addressing whether counsel's performance was substandard. The reason for that holding was that the trial court's "policy" dictated use of restraint and any objection to the belt would not have prevailed. The failure to require an individualized determination was not asserted as a ground of ineffective assistance in *Wrinkles*.

We agree with the State that Stephenson's case presents many similarities to *Wrinkles*. The two are not identical, however, because this record shows no inflexible "policy" of the trial court. Trial counsel Long testified that in his experience, the trial judge typically deferred to the sheriff's security decisions. The sheriff, in turn, cited concerns in transporting defendants from jail to the courtroom as the basis for requiring restraint. These concerns did not seem to relate directly to use of the belt at trial as opposed to its use in transit, but that issue was not explored at the post-conviction hearing. The officers in charge of security at the trial testified that they had no knowledge of any incidents that would demonstrate a need for Stephenson to wear a stun belt. Sheriff Bruce Hargrave; Charlie McCracken, the sergeant in charge of security at Stephenson's trial; Jerry Ash, the deputy of security; police officer Robert Irvin; and Jonetta Baker, jail commander for the Warrick County Police Department, all testified at post-conviction that to their knowledge Stephenson posed no security threat and had exhibited no behavior that would demonstrate a specific need for a restraining device at trial. There was also extensive post-conviction testimony from the sheriff's office and others that Stephenson conducted himself as a "gentleman" throughout the arrest and trial. He had turned himself in in response to reports that law enforcement was looking for him in connection with the murders and made no effort to escape either before or during trial. From the sheriff's testimony, it appears that no one gave careful consideration to the need for any restraint while Stephenson was in the courtroom at his trial. Rather, the need was assumed, and the only concern voiced by the sheriff was whether the jury would see the restraint. Although the record shows that the trial judge followed the

recommendation of the sheriff, it does not indicate that either had an inflexible policy of requiring restraint, or, if so, to what cases it applied.

*Stephenson II* at 1035-37 (citations, quotation marks and footnote omitted).

The Respondent works hard to distinguish the Matthew Wrinkles cases, and it is true that there are differences worth noting. But too, it is inescapable that their similarities were recognized not only by the Indiana Supreme Court, but also by the Seventh Circuit:

> In *Stephenson v. Indiana*, 864 N.E.2d 1022 (Ind. 2007), the Indiana Supreme Court provided similar guidance. In *Stephenson*, the court compared the decision made by Wrinkles's counsel in choosing the stun belt with the same decision made by Stephenson's during his trial. In so doing, the court explained its rationale in *Wrinkles II*:
>
>> At the time of Stephenson's trial in 1996 and 1997, no Indiana ruling had addressed the use of stun belts. As in *Wrinkles*, counsel cannot be faulted for selecting the belt over more visible shackles, given that the case law addressing the issue had largely focused on the visibility of the restraint, and not, as Wrinkles later pointed out, on the belt's potential effect on the defendant's demeanor and ability to participate in the defense.
>
> *Id.* at 1032. The court went on to characterize the decision made by Wrinkles's attorneys as a "tactical decision." The "only real issue" in Wrinkles's trial was sentencing, so "[t]he decision to challenge the belt [there] arguably fell into the tactical range, balancing the likelihood of success against the risk of alienating the judge by challenging an announced 'policy.'" *Id.* Because in Stephenson's case, guilt was "vigorously disputed," a "tactical" classification could not apply. The court went on to hold that the "use of a stun belt, if perceived by the jury, produces all the results that shackling does." After a careful examination of the post-conviction record, the Stephenson court concluded that the jurors had been aware of the stun belt. Nonetheless, the court upheld Stephenson's convictions and death sentence because he had not demonstrated the requisite amount of "prejudice" to establish his ineffective-assistance claim.
>
> This discussion of *Wrinkles II* in *Stephenson* indicates that the above reading is the appropriate one. The section discussing the *Wrinkles II* decision tracks the Indiana Supreme Court's reasoning in the exact manner discussed above. The court recreated the decision facing Wrinkles's attorneys in light of the established form of prejudice at the time. The court again recognized that Wrinkles's attorneys viewed their decision at trial in light of the "visibility of the restraint," and not the "belt's potential effect on the defendant's demeanor and ability to participate in the defense." And just as it had in *Wrinkles II*, the court

concluded that Wrinkles's counsel could not be faulted for failing to predict the prejudice the court would credit in banning the stun belt.

Even with the benefit of this reading, the Indiana Supreme Court unreasonably applied *Strickland* in evaluating Wrinkles's attorneys' performance in *Wrinkles II*. The failure to object itself fell below what is expected under professional norms, regardless of the theory of prejudice. A blanket policy of restraint cannot be squared with the case law at the time of trial. But notwithstanding the propriety of the court's conclusion, it is evident that the court did not make a finding that the jurors had seen the stun belt. Instead, the court in *Wrinkles II* was reconstructing the decision made by Wrinkles's counsel based on the then-established form of prejudice associated with the stun belt.

In light of the nature of the court's reasoning in *Wrinkles II*, the discussion in *Stephenson*, and the implausibility under Indiana law of the Indiana Supreme Court making implicit factual findings, we conclude that the Indiana Supreme Court did not make a finding of fact that the jurors had seen the stun belt. The controlling findings of facts are those set forth by the state post-conviction court and adopted by the *Wrinkles II* court. These findings of fact determined that the jury did not see the stun belt. Additionally, Wrinkles has not presented us with any evidence to demonstrate that the stun belt affected his abilities to properly participate in his own defense. Without evidence that the jurors saw the stun belt, or that he was otherwise affected by the stun belt throughout trial, Wrinkles cannot demonstrate prejudice. *See Strickland*, 466 U.S. at 694. He therefore cannot show that he received ineffective assistance of counsel, so he cannot demonstrate the requisite cause and prejudice necessary to overcome his procedural default. *Guest*, 474 F.3d at 930. Thus, this Court is procedurally barred from examining his freestanding stun-belt claim and must deny the writ.

*Wrinkles v. Buss*, 537 F.3d 804, 822–23 (7th Cir. 2008).

While notably similar, Stephenson's case is also different than *Wrinkles*. If they were identical, then Stephenson would also be denied habeas corpus relief. So, although the Respondent is correct that the *Wrinkles* decision is not "on all fours factually and legally with Stephenson's case" (DE 44 at 6) those differences are beneficial to the Petitioner, not the Respondent.

Unlike *Wrinkles*, here, "guilt was vigorously disputed . . . ." *Stephenson II* at 1032. Here, "several jurors knew that Stephenson wore the belt during trial and recognized it for what it was." *Stephenson II* at 1034. As a result, the Indiana Supreme Court concluded that "Stephenson

has established by a preponderance of the evidence that the belt was 'readily visible' to the jury."

Finally, because the *Wrinkles* court found that the stun belt had not been seen, the *Strickland*

prejudice analysis was resolved on this preliminary question rather than being fully explored. *See*

*Wrinkles*, 537 F.3d at 823 ("Without evidence that the jurors saw the stun belt, or that he was

otherwise affected by the stun belt throughout trial, Wrinkles cannot demonstrate prejudice.").

Thus, the Seventh Circuit did not have occasion to conduct a complete analysis of the prejudice

prong of *Strickland*. Here, because the stun belt was seen by the jury, a full prejudice analysis is

necessary.

3.        ***The Prejudice Prong of* Strickland**

        In his brief in support of the Motion for Summary Judgment, the Petitioner argues that,

"in light of the inherently prejudicial effects of the stun belt itself, there is certainly a reasonable

probability that Stephenson would not have been convicted or sentenced to death but for

counsel's failure to object to the belt." (DE 39 at 10.) Before proceeding further, it is important

to clarify that the Petitioner is not arguing, and this Court is not holding, that this is one of those

very few cases described in *Strickland* where "prejudice is presumed." *Id.* at 692. Errors of that

sort would best be called "presumptively prejudicial" and appear to be limited to instances which

result in the "[a]ctual or constructive denial of the assistance of counsel altogether . . . [along

with] various kinds of state interference with counsel's assistance . . . [or] when counsel is

burdened by an actual conflict of interest." *Id.* This is not a case where trial counsel was totally

absent or constructively denied, nor is it a case where the state interfered with counsel's

representation of Stephenson, or where counsel had a conflict of interest. Therefore requiring

Stephenson to wear a stun belt was not "presumptively prejudicial" as that concept is applied in *Strickland*.

Rather, the issue in this case is whether wearing a stun belt was "inherently prejudicial." The semantic similarities between these seemingly analogous concepts is regrettable, but unlike *Strickland*'s "presumptively prejudicial" errors, the "close scrutiny of *inherently prejudicial* practices has not always been fatal . . . ." *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986) (emphasis added). In *Holbrook*, shackling was described as, "the sort of *inherently prejudicial* practice that . . . should be permitted only where justified by an essential state interest specific to each trial." *Id*. at 568–69 (emphasis added). *Holbrook* was clearly established Supreme Court law a decade before Stephenson's trial and it plainly defines shackling a criminal defendant at trial as "inherently prejudicial," but that classification does not obviate the need for a prejudice analysis the way that a "presumptively prejudicial" error would. Thus, the Court agrees with the Respondent when he argues that "*Wrinkles* does not stand for the proposition that if a petitioner can show that the jury saw the stun belt, that is the end of the inquiry and the petitioner has satisfied the prejudice prong analysis of a *Strickland* claim." (DE 44 at 9.)

> *Holbrook* went on to establish the test for "inherently prejudicial" practices.
>
> Whenever a courtroom arrangement is challenged as *inherently prejudicial*, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play.

*Id*. at 570 (emphasis added). This test is a modification of the standard *Strickland* test which would require a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Nevertheless, regardless of which test is applied, Stephenson has demonstrated prejudice.

**4.      *Indiana Supreme Court's Application of Prejudice Prong***

In *Stephenson II*, the Indiana Supreme Court did not articulate the *Holbrook* test for

inherently prejudicial practices, nor did it apply the *Strickland* test for prejudice even though it

was presented. Rather *Stephenson II* erroneously analyzed whether counsel's objection would

have been sustained. Not only was its answer to that question clearly erroneous (as previously

discussed), this was not the correct question to be asking.[3] Because the Indiana Supreme Court

did not identify, nor apply, the proper test for prejudice, its determination cannot have been a

reasonable "application of, clearly established Federal law, as determined by the Supreme Court

of the United States." 28 U.S.C. § 2254(d)(1). *Stephenson II* is contrary to the clearly established

precedents of *Strickland* and *Holbrook*, because it applied the wrong test for determining

prejudice. Thus, this court must now apply those tests and determine whether Stephenson has

demonstrated prejudice.

Under either the basic *Strickland* test for prejudice or the modified *Holbrook* test for

inherently prejudicial errors, Stephenson has demonstrated prejudice. *Strickland* explains that

"the question is whether there is a reasonable probability that, absent the errors, the factfinder

---

[3]      Prejudice is not determined by asking whether the objection would have been sustained or resulted in a reversal on direct appeal. Determinations about the sustainability of an objection are intertwined with the deficient performance prong of the *Strickland* test, but they cannot be a part of the prejudice prong. This is true because it cannot be deficient performance to fail to make an unsustainable objection which does not lay the foundation for reversal on appeal. So too, if the sustainability of an objection were the proper test of prejudice, then the question of prejudice would merely duplicate the analysis of deficient performance and Strickland's two prongs could merge into one.

would have had a reasonable doubt respecting guilt." *Id.* at 695. This requires Stephenson to do more than merely show that he had a legally meritorious objection. Because the objection was not presented and preserved at trial, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Thus the prejudice question turns not on the error alone, but on the impact of the error on the determination of guilt.

*Strickland* explained that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695–96. Here, the error must be considered among the former because, as the Indiana Supreme Court described, it caused Stephenson to be "branded a dangerous individual." *Stephenson II* at 1034.

*Strickland* also explained that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. Here again, the error must be considered among the former because the Supreme Court of Indiana found that the evidence against Stephenson was not overwhelming. In analyzing the prejudice prong of *Strickland*, it wrote that "[t]here was less than a conclusive amount of physical evidence connecting Stephenson to the crime." *Stephenson II* at 1039 n.6. The State court affirmatively rejected the notion that there was overwhelming evidence in this case. After discussing *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002), the State court wrote,

> Unlike *French*, Stephenson's failure to prove a reasonable probability of a different result does not rest on essentially indisputable evidence that establishes the merits of his conviction and sentence. Rather, Stephenson has shown no prejudice because he has not shown a reasonable probability that an objection, if made, would have been successful in the trial court, or would have produced the basis for a successful appeal.

*Stephenson II* at 1039–40 (footnote 6 omitted). Thus the State court considered and rejected the doctrine of overwhelming evidence as a basis for denying the appeal.

Finally, *Strickland* explained that "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696. Here, Stephenson has demonstrated that in his trial there was an error that created a pervasive impact on the verdict which was supported by less than a conclusive amount of evidence. Thus, "despite the strong presumption of reliability, the result of th[is] particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696.

Under *Holbrook*'s test for "inherently prejudicial" errors, the result is the same. Forcing Stephenson to wear the stun belt without justification created an unacceptable risk that impermissible factors came into play in the determination of his guilt. The Indiana Supreme Court recognized these factors in *Stephenson II*.

> As explained in *Deck*, three reasons underlie the prohibition on unnecessary shackling. First, visible shackling "undermines the presumption of innocence and the related fairness of the fact-finding process." *Id.* at 630. Second, shackling can interfere with the defendant's ability to communicate with his lawyer and participate in the defense. *Id.* at 631. Third, shackles impair the dignity of the judicial process. *Id.* at 631-32.
> We have already noted that Indiana state law no longer permits the use of stun belts in Indiana courts, but that rule had not been announced at the time of Stephenson's trial. The prohibition of stun belts is not based solely on the considerations that underlie the prohibition on jail garb. It is also grounded in the perceived effect on the defendant of the threat of imminent high voltage. It thus is not wholly dependent upon the jury's awareness of the belt, and, like jail garb, is "inherently prejudicial." *Wrinkles*, 749 N.E.2d at 1194.

*Stephenson II* at 1029. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the

foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453

(1895).

      First, the criminal process presumes that the defendant is innocent until proved guilty. Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process. It suggests to the jury that the justice system itself sees a need to separate a defendant from the community at large.

      Second, the Constitution, in order to help the accused secure a meaningful defense, provides him with a right to counsel. The use of physical restraints diminishes that right. Shackles can interfere with the accused's ability to communicate with his lawyer. Indeed, they can interfere with a defendant's ability to participate in his own defense, say by freely choosing whether to take the witness stand on his own behalf.

      Third, judges must seek to maintain a judicial process that is a dignified process. The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve. The routine use of shackles in the presence of juries would undermine these symbolic yet concrete objectives. As this Court has said, the use of shackles at trial affronts the dignity and decorum of judicial proceedings that the judge is seeking to uphold.

*Deck v. Missouri*, 544 U.S. 622, 630 (2005) (citations and quotation marks omitted).

      The use of a stun belt, if perceived by the jury, produces all of the results that shackling does. It sends a signal that the defendant may be dangerous and thereby impairs the presumption of innocence; it interferes with the defendant's communication with his attorney; and it has the same effect on the dignity of the process. Indeed, some courts have concluded that a stun belt, if perceived by the jury, "may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant." *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002) (*quoting State v. Flieger*, 91 Wn. App. 236, 955 P.2d 872, 874 (Wash. Ct. App. 1998)). Even if the jury is unaware of the belt, there remain the concerns that a stun belt "could disrupt a different set of a defendant's constitutionally guaranteed rights." *Id.* First, "[a] stun belt seemingly poses a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles." *Id.* Second, the device poses a greater threat to the defendant's Sixth Amendment and due process rights to be present and participate in his defense because "[i]t is reasonable to

assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt."

*Stephenson II* at 1033 (brackets in original).

Stephenson has demonstrated that there was an unacceptable risk that impermissible factors came into play in the determination of his guilt. Therefore, he has demonstrated prejudice under both the *Holbrook* and *Strickland* standards, and habeas corpus must be granted. Due process mandates that John M. Stephenson is entitled to what he was denied: a trial without restraints unless the State can demonstrate a particularized justification for doing so at his retrial. Therefore, habeas corpus relief must be conditionally granted. "Conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one." *Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005) (Scalia J., concurring). Thus the State of Indiana is free to re-try John M. Stephenson, providing that it files appropriate documents in the State trial court seeking such relief within 120 days of this Order. If he is re-tried, nothing in this Opinion prevents the State from again seeking the death penalty.

**CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment (DE 39) is **GRANTED** and the Great Writ is conditionally **GRANTED** on Ground 1. The State of Indiana may re-try John M. Stephenson, providing that it files appropriate documents in the State trial court seeking such relief within 120 days of this Order.

SO ORDERED on July 1, 2009.

     s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION