# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

JOHN M. STEPHENSON,   )
           )
     Petitioner, )
           )  CAUSE NO. 3:07-CV-539-TS
   v.       )
           )
MARK LEVENHAGEN,   )  DEATH PENALTY CASE
           )
     Respondent. )

## OPINION AND ORDER

This matter is before the Court on remand following the Mandate from the Seventh Circuit Court of Appeals [ECF No. 70]. The Petitioner, John M. Stephenson, filed his First Petition for Writ of Habeas Corpus [ECF No. 19] on February 4, 2008. The State filed its Response [ECF No. 28] on August 8, 2008. On September 2, 2008, the Petitioner filed a Motion for Summary Judgment [ECF No. 39]. The State filed a Response [ECF No. 44] on December 3, 2008, to which the Petitioner filed a Reply [ECF No. 45] on December 15, 2008. After a Hearing on March 5, 2009 [ECF No. 49], the Court on July 1, 2009 filed an Opinion and Order [ECF No. 50] granting the Petitioner's Motion for Summary Judgment, and conditionally granting the Great Writ on Ground 1. The State appealed, and on January 24, 2011, the Seventh Circuit Court of Appeals filed a Mandate [ECF No. 70] Reversing the judgment of this Court and Remanding for consideration of the Petitioner's remaining claims. The Petitioner filed a Traverse to and Motion in Support of the Habeas Petition [ECF No. 81] on April 3, 2012, and the State filed a Response [ECF No. 85] on July 6, 2012. The Petitioner filed a Sur-reply [ECF No. 86] in support of his petition on September 7, 2012.

## FACTUAL AND PROCEDURAL BACKGROUND

The Supreme Court of Indiana has published two opinions related to this case:

*Stephenson v. State*, 742 N.E. 2d 463 (Ind. 2001) (*Stephenson I*), and *Stephenson v. State*, 864 N.E. 2d 1022 (Ind. 2007) (*Stephenson II*). In addition, this Court issued a decision granting the Petitioner's motion for Summary Judgment and conditionally granting the Great Writ solely on Ground 1, a claim of ineffective assistance of counsel arising from the failure of Petitioner's trial counsel to object to a stun belt being placed on the Petitioner throughout his trial and sentencing. *Stephenson v. Levenhagen*, 2009 WL 1886081 (N.D. Ind., July 1, 2009), *rev'd and remanded sub nom. Stephenson v. Wilson*, 619 F.3d 664 (7th Cir. 2010) (*Stephenson III*). The Court of Appeals for the Seventh Circuit reversed this Court's adjudication of Ground 1, holding that while it was deficient performance not to object to the State's use of a stun belt, the Petitioner was not prejudiced at the guilt phase of his trial. *Stephenson v. Wilson*, 619 F.3d 664 (7th Cir. 2010) (*Stephenson IV*). The Court of Appeals remanded the case to this Court with instructions to rule on each of the Petitioner's remaining claims. The Court of Appeals also instructed this Court to decide whether the deficient performance of trial counsel prejudiced the Petitioner at his sentencing hearing, at which he was sentenced to death. *Id.*

In its opinion denying the Petitioner's direct appeal, the Indiana Supreme Court laid out the facts and prior history of the case.

> In the early evening on March 28, 1996, Defendant John Matthew Stephenson and his friend, Dale Funk, drove around Warrick County. The two ended up at the residence of Brian Mossberger, a friend of the Defendant and an acquaintance of Funk. While there, Defendant and Funk shot off rounds of firearms with Defendant shooting his own SKS assault rifle. Defendant and Funk left to go target shooting at a railroad crossing on Red Brush Road located near Mossberger's home. Afterwards, Defendant, who was still accompanied by Funk, drove to the mobile home of Brandy Southward and her fiancé, Troy Napier. According to Funk's testimony, they both got out of the car and walked around the mobile home. Defendant yelled for someone but after no one answered, Funk

returned to the car and Defendant proceeded toward the mobile home. A few moments later, Funk observed Defendant walk out the front door carrying a splitting maul.

Defendant and Funk returned to Mossberger's house. Shortly thereafter, a pick-up truck briefly pulled into Mossberger's driveway. John "Jay" Tyler was the driver of the truck and his wife, Kathy Tyler, and friend Brandy Southard were the passengers. Mossberger testified that Defendant said, "There goes Jay and I've got to catch him." (R. at 24,669.) Funk testified that Defendant said, "If you're coming, come on." (R. at 23,969.)

The evidence as to what happened next comes solely from Funk's testimony at trial. Funk testified that Defendant began chasing the Tyler truck through Warrick County rural roads. The Tyler truck stopped at the intersection of Eble and Youngblood roads and Defendant also stopped his car. The driver-side door of the truck opened slightly, and Jay leaned out of the truck to look at Defendant. At that point, Defendant grabbed his SKS assault rifle, exited the car, and began firing several shots at the Tyler truck. Defendant got back into the car, drove around a corner, stopped his car and got out. Defendant walked towards the Tyler truck and returned a few minutes later. Defendant threatened Funk stating, "You breathe a word of this and I'll kill you." (R. at 23,980-80.)

Defendant and Funk then drove directly back to Mossberger's house. Mossberger testified that Defendant held a knife with "red smears" on the blade, by his (Defendant's) face and said, "Jay, Kathy, and Brandy are no more." (R. at 24,674-75.) Mossberger also testified that Defendant washed his knife in the kitchen sink and that Defendant instructed him to "do something with the SKS; get rid of it; make it gone." (R. at 24,678.) Funk offered similar testimony, stating that he observed Defendant "hand[] the gun to [Mossberger]; told him to get rid of it." (R. at 23,982.) The next day, Mossberger buried the SKS assault rifle and ammunition in the woods.

Early Friday morning, March 29, police officers discovered the Tyler truck. Inside the truck, the police officers found victims John "Jay" Tyler, Kathy Tyler, and Brandy Southard dead from gunshot and stab wounds. The police officers also discovered bullet holes in the truck and found spent shell casings scattered across the width of Youngblood Road. Forensic testing revealed that the fatal bullets matched those fired from the SKS assault rifle belonging to Defendant. The spent shell casings matched the ammunition discovered in Southard and Napier's mobile home. Other testing revealed Funk's shoe prints were at the mobile home, directly below the broken window. Although the knife used in the killings was not recovered, Defendant owned a similar knife that could have caused the victims' injuries. On that Friday night, Defendant contacted police about the murders and gave a written statement indicating that Brandy Southard had received a threat from one Jimmy Knight.

On Saturday, March 30, while at home, Defendant voluntarily gave a taped statement to Officers Michael Hildebrand and Gary Gilbert and consented to a police search. In his taped statement, Defendant admitted to having seen and talked to the victims on March 28th at around 9:30 or 10:00 p.m. at a local Circle S store. Defendant also stated that afterwards, he went to Mossberger's house and then went straight home.

On Sunday, March 31, Mossberger retrieved the SKS assault rifle and ammunition, placing the SKS in the house and the ammunition in his garage. Police officers arrived at Mossberger's house to question him, and he explained the events that occurred on the day of the killings. Mossberger also showed the officers the SKS assault rifle, but not the ammunition. The same day, Mossberger directed the officers to Funk's apartment in Hatfield. Police officers questioned both Mossberger and Funk and took Funk into custody for further questioning at the Warrick County Security Center. Funk was released on or about April 1. On April 3, 1996, Defendant surrendered himself to the Owensboro Police Department.

The State charged Defendant with burglary, theft, and three counts of murder of each of Jay Tyler, Kathy Tyler, and Brandy Southard. The State also sought the death penalty, alleging as aggravating circumstances that Defendant intentionally discharged a firearm from a vehicle, committed at least one of the murders by lying in wait, and committed multiple murders.

The trial commenced on September 23, 1996. On May 8, 1997, after deliberating for approximately three hours, the jury found Defendant guilty of burglary, theft, and all three counts of murder. On May 19, 1997, the trial court conducted the penalty phase and the jury recommended that the death penalty be imposed based upon the multiple murder aggravator. The trial court held a sentencing hearing on June 16, 1997. The trial court followed the jury's recommendation and sentenced Defendant to death.

*Stephenson I* at 470–72 (Ind. 2001) (brackets in original, footnotes omitted). Stephenson then

sought and was denied a Writ of Certiorari to the United States Supreme Court. *Stephenson v.*

*Indiana*, 534 U.S. 1105 (2002).

Following the conclusion of his direct appeal, Stephenson, by appointed counsel, filed a

petition for postconviction relief. (App. to Br. of Pet'r-Appellant at 144–58, *Stephenson v. State*,

87S00-0106-PD-285). That petition was denied, and he appealed to the Supreme Court of

Indiana. In its opinion affirming that denial, the Indiana Supreme Court reviewed and analyzed

the ineffective assistance of counsel claim that is the subject of this Opinion. After his petition

for rehearing was denied by the Indiana Supreme Court, he sought and was denied a Writ of

Certiorari to the United States Supreme Court. *Stephenson v. Indiana*, 552 U.S. 1314 (2008)

(denying petition for writ of certiorari). He then initiated this habeas corpus proceeding.

## STANDARD OF REVIEW

In a Habeas Corpus proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner is able to rebut that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In evaluating a legal determination made by a state court, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that

> when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

*Brown v. Payton*, 544 U.S. 133, 141 (2005) (citations omitted). Additionally,

> [f]or purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by this Court refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision. We look for the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.

*Yarborough v. Alvarado*, 541 U.S. 652, 660–61(2004) (quotation marks and citations omitted).

Furthermore, the United States Supreme Court has made clear that it is not for this Court to independently decide the merits of the Petitioner's legal arguments. Specifically, the Supreme Court noted the following:

> As we have explained, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a [United States] Supreme Court case incorrectly. Rather it is the habeas applicant's burden

to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.

*Price v. Vincent*, 538 U.S. 634, 641 (2003) (internal quotation marks, citations, and brackets omitted).

## ANALYSIS

### A.      Ineffective Assistance of Counsel: Failure to Investigate and Present Potentially Mitigating Evidence

As a ground for Habeas relief, the Petitioner alleges ineffective assistance of counsel due to his trial counsel failing to sufficiently investigate and present potentially mitigating evidence during the sentencing phase of his trial, which ended with a sentence of death. To prevail on his ineffective assistance of counsel claim, the Petitioner must show the following two things: first, that his counsel's performance was deficient, and second, that he was prejudiced by his counsel's unprofessional errors. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is more than just an isolated mistake. To show deficient performance, the Petitioner must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [Petitioner] by the Sixth Amendment." *Id.* The measure of attorney performance is reasonableness under prevailing professional norms. *Id.* at 688. When the alleged ineffectiveness involves a decision not to pursue certain avenues of investigation, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." *Id.* at 690–91. In determining whether trial counsel's performance was deficient, the Court "recognize[s] that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

To establish prejudice, the Petitioner must show "that counsel's errors were so serious as to deprive the [Petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. This requires

a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.*

The Petitioner contends that his trial counsel's failure to present mitigating evidence at the sentencing phase of his trial was deficient performance. The Petitioner also contends that this decision should not be viewed as a legitimate strategic decision, because the investigation into potential mitigating evidence was so inadequate as to be unreasonable according to prevailing professional norms. Furthermore, the Petitioner argues that, if not for this error, there is a reasonable probability that the jury would have sentenced the Petitioner to life in prison rather than death.

The Indiana Supreme Court adjudicated this claim on the merits, affirming the postconviction court's conclusion that, while the mitigating evidence "could have been more thoroughly developed and investigated," the Petitioner's trial counsel was not deficient in handling the sentencing phase of the Petitioner's capital murder trial. *Stephenson II*, 864 N.E.2d at 1045–46. That adjudication is entitled to deference under the AEDPA, which provides that a state court's adjudication of the merits of a habeas petitioner's claim will not be disturbed unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is contrary to clearly established federal law "if it applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the United States Supreme Court] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court adjudication involves an unreasonable application of clearly established federal law "if the state

court applies [the United States Supreme Court's] precedents to the facts in an objectively unreasonable manner." *Id.* A state court's adjudication of a claim on the merits may also be disturbed if it involves an unreasonable determination of the facts. 28 U.S.C. §2254(d)(2).

**1.** **Factual and Procedural Background**

a. *The Alleged Failure to Investigate and Failure to Present Mitigating Evidence*

In preparing the defense's strategy for the sentencing hearing, one of the Petitioner's attorneys was tasked with preparing for the sentencing phase of the trial. In addition, a mitigation specialist was employed to help with the investigation into the Petitioner's life. The Petitioner's counsel in charge of this investigation testified at the postconviction hearing that the mitigation investigation began before the jury began to hear evidence, and most likely before *voir dire* (though he admitted he could not remember the latter with certainty). (PC 418.)[1] Counsel testified that he traveled to Beaumont, Texas, and interviewed a number of people who had known the Petitioner as a child. (PC 431.) In the course of this investigation, he learned that the Petitioner had suffered from enuresis, or bed-wetting, at a young age, and that this was brought on by psychological trauma. (*Id.*) He also learned about the Petitioner's brushes with the law as a young adult.

Counsel interviewed the Petitioner's mother, Betty Ford Weeks, by phone. (PC 572.) Weeks testified at the postconviction hearing that the Petitioner's youthful brushes with the law in Texas were discussed during the phone conversation. She testified that she told counsel about an incident where the Petitioner, then 18 years old, had pled guilty in a Louisiana court to burglary for breaking into a game room and stealing $43.00 from a game machine. (PC 563, 573.) She also testified that she told the Petitioner's counsel about an incident where the

---

[1] Citations to the State postconviction hearing will be cited as "PC __" throughout the opinion.

Petitioner was test driving a car that two of his coworkers at the time had offered to sell him for $1,000. Weeks recalled that the Petitioner was pulled over while test driving the car, and the car turned out to be stolen. (PC 574.) On another occasion, the Petitioner had thrown a party at his parents' house when they were away. (PC 566.) Marijuana and alcohol were consumed by those attending the party. (PC 567.) A girl who had been at the party later cashed $600.00 in checks stolen from Weeks' bedroom, and this was how the Petitioner's parents learned what had happened. (*Id*.) This incident precipitated the Petitioner's commitment to a drug treatment facility at the insistence of his parents, where he remained only days before checking himself out. (PC 564, 566–67.)

While Weeks testified that she had spoken with counsel about the Petitioner's substance abuse and criminal history, she also testified that, to the best of her recollection, counsel did not ask detailed questions about the Petitioner's childhood, or what the Petitioner was like as a person. (PC 567.) Weeks also testified that she had suffered a brain aneurism in 1995, and that it had affected her short term memory. (PC 569, 572.) She stated that she wanted to come to Indiana to attend the trial, but that counsel told her that she could not watch the trial, because she was a potential witness. (PC 568.) If she had been called to testify at the sentencing hearing, Weeks would have testified that the Petitioner was considerate of others, and that he often helped others without being asked. (PC 567.)

Trial counsel interviewed the Petitioner's father, Billy Lynn Stephenson, in Beaumont, Texas. (PC 418.) He testified that counsel told him he would not be able to attend the trial, because he was a potential witness. (PC 582.) Though he was never called to testify at the sentencing hearing, he would have testified that the Petitioner is "a caring individual," and that he didn't think his son could have committed the murders. (PC 584.)

The Petitioner's younger sister, Linda Gayle Jackson, testified at the postconviction hearing. She testified that she did not have many memories of the Petitioner from when they were children. (PC 589.) As an adult, however, the Petitioner lived with her for a time in Virginia in late 1988 and early 1989. (*Id*.) She testified that the Petitioner was "easy to get along with" and that he went to work every day. (PC 590.) She also testified that she suspected he was drinking during that time, but that he "never brought it home." (*Id*.) The Petitioner's mitigation specialist interviewed Jackson by phone. (PC 594.) Jackson testified that he asked her "a few" questions about the Petitioner, but "[n]othing really specific." (PC 595.) Jackson testified that she would have come to the sentencing hearing and testified had she been asked, but that she was not asked. (PC 594.)

The Petitioner's older sister, Rhonda Sue LaFleur, also testified at the postconviction hearing. LaFleur testified that both the mitigation specialist and Petitioner's counsel contacted her. (PC 605.) The conversation lasted about thirty minutes. (*Id*.) She testified that she could not recall what was discussed, because she was focused on nursing school at the time. (PC 606.) She testified that she did remember being told that she should not come to Indiana during her summer break, because she was a potential witness and therefore would not be able to watch the trial. (*Id*.) LaFleur testified that she would have been willing to testify on the Petitioner's behalf at the sentencing hearing. (PC 607.)

Dr. David Stephenson, the Petitioner's older brother, also testified at the postconviction hearing. He testified that the Petitioner had lived with him in Newburgh, Indiana, immediately following the Petitioner's release from prison in Virginia. (PC 611.) Dr. Stephenson testified that he had spoken with many people, including the Petitioner's trial counsel. (PC 621.) Dr. Stephenson mentioned that he learned details of the Petitioner's life from the Petitioner's counsel

of which he had previously been unaware. (*Id*.) For example, he testified that counsel "had done his research and obtained some medical records" showing that the Petitioner had been treated for an abnormally small bladder. (*Id*.) Dr. Stephenson also stated that his interview with trial counsel was less thorough than his interview with postconviction counsel. (PC 622.)

Dr. Stephenson testified about the Petitioner's upbringing and childhood in some detail at the postconviction hearing. He testified that the Petitioner was in and out of trouble from kindergarten on. (PC 614.) He testified that he believes the Petitioner suffered from undiagnosed and untreated attention deficit disorder. (PC 613.) He also testified that the Petitioner's bed-wetting continued into junior high school, and that this made the Petitioner a frequent target of bullying. (PC 614.) He related an incident that occurred in the home, in which he remembered the Petitioner crying as he was "grabbed out of bed and thrown into a cold bath" after wetting the bed. (PC 615.) Dr. Stephenson testified that their parents would say that he (Dr. Stephenson) was the smart one in the family, in implicit contrast to his younger brother, the Petitioner. (PC 614.) Dr. Stephenson testified that the Petitioner had always had trouble fitting in, and was consequently desperate for approval. (*Id*.) This desire for acceptance and approval led to the Petitioner falling in with the "wrong crowd." (*Id*.)

Dr. Stephenson also testified about the Petitioner as an adult. He testified that the Petitioner worked in construction while he lived with Dr. Stephenson, and that people for whom the Petitioner had done work raved about what good work he did. (PC 618.) Dr. Stephenson also testified about the Petitioner's drinking problem, stating that the Petitioner was a binge drinker. (*Id*.) He testified that he had discussions with the Petitioner about his drinking. (*Id*.) He specifically recalled an occasion when he told the Petitioner that drinking was always the underlying cause when the Petitioner got into trouble. (*Id*.) According to Dr. Stephenson, the

Petitioner thought for a moment, and then responded by saying, "[y]eah, you're right." (*Id.*) The Petitioner cut down on drinking "for a while" after that conversation. (PC 615.) Dr. Stephenson also testified that he warned the Petitioner about the consequences of owning a gun as a convicted felon still on parole. (PC 619.)

In addition to family, there was a witness, Charles William Carter, who would have testified that the Petitioner saved him from drowning in the Ohio River. (PC 456–57.) Carter's wife wrote a letter to the Petitioner's trial counsel explaining what the Petitioner had done for her husband. (PC 460.) Carter testified that he would have been willing to testify about the incident at the Petitioner's sentencing hearing if he had been asked to do so. (PC 460.)

The Petitioner's trial counsel also learned of potentially devastating bad character evidence that the State possessed and intended to use if the defense opened the door. For instance, the Petitioner had a prior conviction in Virginia for shooting a firearm at an occupied dwelling. He once struck a man in the head with a shovel outside a bar in Newburg, Indiana, though he was only arrested and not convicted in connection with that incident. The Petitioner's ex-wife testified at the postconviction hearing that the Petitioner had been excessively controlling and physically abusive, even putting her in the hospital once. (PC 638.) A defense attorney would consider these prior bad acts damaging to his client at a capital sentencing. Shooting into an occupied dwelling involves violence with a firearm, and shows recklessness with respect to human life. The crime of conviction in the present case was the murder of three people with a firearm. Domestic violence severe enough to require hospitalization of the Petitioner's ex-wife, and striking a man in the head with a shovel show a proclivity for violence.

On the other hand, the Petitioner's postconviction counsel uncovered mitigation evidence that trial counsel had not discovered. Some of it would have tended to mitigate the damage of

some of the Petitioner's prior convictions and bad acts. For example, the Petitioner's lawyer in Virginia, where the Petitioner was convicted of shooting into an occupied dwelling, would have testified that Stephenson had been harassed and threatened by people in his neighborhood, and that he had arrived home, intoxicated, to find that his car window had been broken. Counsel also believed it was unclear whether the Petitioner or his friend had fired the shot, though it is doubtful that the trial judge would have permitted the Petitioner to re-litigate his prior conviction at the sentencing hearing. At any rate, the Petitioner's trial counsel never spoke to the attorney who represented the Petitioner in the Virginia case, instead relying on a file given to him by the prosecutor. (PC 452.) In addition, a witness to the bar fight involving the Petitioner could have testified that the man the Petitioner hit with a shovel in the bar parking lot had first claimed to have a gun and threatened to shoot the Petitioner. The Petitioner's trial counsel never spoke to that witness either. (*Id*.) The Petitioner argues that this evidence, had his trial counsel discovered it, would have so altered the balance as to make it unreasonable for counsel to forgo presentation of the other mitigating evidence out of fear of opening the door to those prior bad acts.

Another witness, Brad Schumacher, would have testified that the Petitioner had stopped and helped a stranded motorist whose car had broken down by the side of the road. Schumacher worked at a drug store. (PC 648.) One of his customers had seen the Petitioner walk in, and asked who he was. (*Id*.) The customer told Schumacher that her car had broken down on the side of the road, and that the Petitioner had stopped to help her, devising a temporary fix using pieces of a tin can that allowed her to drive the vehicle to a mechanic for more permanent repairs. (*Id*.) The motorist had offered to pay the Petitioner for his assistance, as he spent over an hour working on her car, but the Petitioner refused to accept any money. (*Id*.)

Other undiscovered and potentially mitigating evidence would have shed more light on the Petitioner's childhood. For example, two mental health experts testified at the postconviction hearing. Dr. Michael Ryan also examined the Petitioner and testified at the postconviction hearing. Dr. Ryan testified that, in his opinion, the Petitioner did not have a learning disability. (PC 695.) In Dr. Ryan's opinion, the Petitioner suffered from "a severe psychiatric disorder which interferes with his memory and cognitive abilities." (PC 696.) Dr. Ryan testified that the Petitioner's cognitive and memory problems, which he directly observed when he examined the Petitioner, could be caused either by long-term substance abuse, or emotional issues, or both. (PC 697.) Because Dr. Ryan is not an expert on substance abuse, he recommended that the Petitioner's postconviction counsel consult an expert in that field and counsel did so. (PC 698.) He also testified about the contents of the Petitioner's school records, which trial counsel had tried, but failed, to locate. He noted that the school records indicate that the Petitioner was a very troubled child, with few friends, and prone to frequent disruptive and oppositional behavior in school. (PC 703.) He testified that the school records indicate that the Petitioner would exhibit angry outbursts over minor stresses. (PC 701.) Dr. Ryan testified that he saw evidence in the Petitioner's school records that the Petitioner had been expelled from kindergarten, which, he noted, is extremely rare. (PC 706.) He described the Petitioner's family life as "dysfunctional." (PC 703.) Dr. Ryan also testified that he saw no evidence in the school records that the Petitioner ever received treatment or therapy for his issues, although it was not possible to be sure from the school records whether he was given medication. (PC 703.)

Dr. Robert L. Smith, an expert in chemical dependency, testified at the postconviction hearing about the Petitioner's alcoholism and drug abuse, which began when the Petitioner was just twelve or thirteen years old. (PC 667.) Dr. Smith testified about the Petitioner's short time in

rehabilitation, during which the Petitioner was not effectively prevented from continuing his drug abuse. (PC 668.) Dr. Smith believes that this was a major reason for the ineffectiveness of the treatment. (*Id.*) He also testified concerning the reasons a person might begin abusing substances and how an addiction develops. Specifically, he testified about the Petitioner's home life, and the inadequacy of his support structure. (PC 665–66.) Furthermore, Dr. Smith commented on the Petitioner's difficulty making connections with others, apart from connections that revolved around substance abuse. He also opined that the Petitioner suffers from a mixed personality disorder. Dr. Smith also noted that the Petitioner suffered several traumatic events in his childhood, including his mother's long battle with thyroid cancer beginning when the Petitioner was eight years old, a history of beatings by both of his parents with a belt or switch, and multiple instances of being thrown into a tub of cold water after wetting the bed. (PC 665–66.) In addition, the Petitioner had told Dr. Smith that he had been fondled by a female babysitter at the age of twelve, and that at fifteen he had been forced by an adult male to engage in oral sex. (PC 666.)

Dr. Smith did testify about the Petitioner's criminal history and abusive behavior toward his ex-wife, explaining how his personality disorder and substance abuse contributed to the incidents of abuse. That criminal history, however, does not appear to have been the basis for Dr. Smith's expert opinion. Instead, the diagnosis was offered as an explanation of the incidents, rather than the incidents being pointed to as evidence supporting Dr. Smith's diagnosis. The diagnosis itself was based on an actual examination and interview of the Petitioner, during which Dr. Smith administered several generally accepted psychological tests. Dr. Smith also interviewed the Petitioner's family members about his childhood. It is important to note that at the postconviction stage of the proceedings, postconviction counsel specifically asked about the

Petitioner's criminal history. If trial counsel had offered this testimony at trial or at the sentencing stage, the questions could have been tailored to avoid discussion of criminal history, as the Petitioner's criminal history was not the basis for Dr. Smith's diagnosis.

Dr. Smith also addressed the Petitioner's confession in the case. Specifically, he testified regarding the Petitioner's confusion about the timeline of events the night of the murder. Police noted that the Petitioner was drinking when he made the statement, but that he did not appear intoxicated. Dr. Smith explained that years of alcohol abuse can cause many classic outward signs of intoxication to be absent, even when the subject is significantly cognitively impaired. That in turn could potentially explain the inaccuracies in the Petitioner's statement to police, which were used against the Petitioner at trial. But while Dr. Smith testified that intoxication might have been the cause of the Petitioner's inaccurate statements to police regarding the timeline of the night of the murders, he also testified that nothing about the Petitioner's mental problems would rule him out as having committed the murders. (PC 690.)

b.      *The Indiana Supreme Court's Adjudication of This Claim*

The Indiana Supreme Court considered and rejected this claim of ineffective assistance of counsel on the merits. The Petitioner argues that the Indiana Supreme Court applied *Strickland* unreasonably in concluding that trial counsel's mitigation investigation and his presentation at the sentencing phase were exercises of reasonable professional judgment. There is no question that *Strickland* is clearly established federal law as determined by the United States Supreme Court. However, when a claim has been adjudicated on the merits by the state courts, "a federal habeas court may not issue the writ simply because the court concludes that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v.*

*Taylor*, 529 U.S. 362, 410–11 (2000). For the Petitioner to be entitled to habeas relief on this claim, the Court must find that the Indiana Supreme Court's adjudication of the claim was not merely erroneous, but objectively unreasonable.

The Indiana Supreme Court found that the record supported the postconviction court's conclusion that "[trial] counsel's decision not to open up [the Petitioner's] background to allow [prior bad act] evidence to be presented to the jury by the prosecution during the death penalty phase of the trial cannot be said to be unreasonable or irrational, or ineffective assistance of counsel." *Stephenson II*, 864 N.E. 2d at 1045. The Indiana Supreme Court was persuaded that "placing the Petitioner's character in issue would open the door to rebuttal evidence of [the Petitioner's] significant criminal history." *Id.* It also rejected the Petitioner's argument that the United States Supreme Court's decision in *Rompilla v. Beard*, 545 U.S. 374 (2005), required a reversal of the postconviction court's ruling. The Indiana Supreme Court distinguished *Rompilla* on the ground that *Rompilla* involved a failure to investigate whether the defendant's prior convictions really were of such a nature as to make the defendant eligible for the death penalty in the first place, while in this case the best that any amount of investigation of the Petitioner's prior convictions could have accomplished would have been to soften the blow of the extensive criminal history evidence that would have been introduced to rebut any good character evidence the defense might have proffered. *Id.* As the Indiana Supreme Court put it, "[d]efeating an eligibility aggravator avoids the death penalty. Establishing some mitigating character evidence does not close a door, and might open one." *Id.* at 1046.

c.      Allen v. State

The Petitioner cites *Allen v. State*, 749 N.E.2d 1158 (Ind. 2001), in support of his ineffective assistance claim. In *Allen*, the petitioner, after being convicted of murder and sentenced to death, sought postconviction relief and the Indiana Supreme Court issued a decision on his petition. *Id.* Allen argued that his counsel was ineffective during the penalty phase of his trial because he did not present evidence regarding Allen's family history, abuse during incarceration at the Indiana Boys School (IBS), and testimony from experts analyzing that evidence. *Id.* at 1171. During the postconviction hearing, Allen presented testimony from three sisters and a close friend regarding the challenges of his upbringing and his role as protector of the family. *Id.* He also presented the testimony of former IBS employees and men who were detained at IBS at the same time as the Petitioner. *Id.* at 1172. Finally, he presented testimony of mental health professionals that detailed the difficulty of the petitioner's childhood and how that might have affected his behavior later in life. They also diagnosed him as having mental disorders and found that he had a low level of intelligence. *Id.*

Allen's counsel testified during a postconviction hearing that his main goal during the penalty phase was to keep the jury from learning about his client's criminal history, which included eight convictions including numerous burglaries and robberies of elderly women. *Id.* The criminal history also included a voluntary manslaughter conviction that involved circumstances similar to the facts of the case he was appealing. *Id.* The Indiana Supreme Court found that "evidence of prior crimes became admissible when they were relevant to rebut a trait of good character that the defendant placed into evidence." *Id.* at 1173. That court held that trial counsel's performance was not deficient for not presenting the testimony regarding family history, because presenting such evidence would have opened the door to the criminal history.

*Id.* The court also held that presenting evidence of abuse suffered while incarcerated would open the door to questions about the reason for his incarceration, and that this in turn would open up the entire criminal history, lest the jury mistakenly infer that there was no criminal history apart from what they were told. Counsel therefore was not deficient for choosing not to present that evidence. *Id.* at 1174.

With regard to the testimony of three mental health experts, the court evaluated each expert individually. *Id.* Trial counsel properly avoided using the testimony of a social worker regarding Allen's childhood development, because it was based on the same good character testimony of friends and family that would have opened the door to criminal history. *Id.* The court also found that the testimony of a forensic psychologist, Dr. Mark Cunningham, regarding Allen's potential for committing a violent act while in prison, was reasonably avoided for strategic reasons. His testimony necessarily would have relied on Allen's previous conduct while incarcerated, which would have opened the door to his previous convictions. *Id.*

The court did conclude, however, that the postconviction court improperly found that the testimony of Dr. Robert Heilbronner, a neuropsychologist, regarding the Allen's mental health would have opened the door to criminal history evidence. *Id.* Dr. Heilbronner diagnosed several brain dysfunctions that could limit Allen's ability to control his behavior. *Id.* at 1174. The Indiana Supreme Court held that "[t]here is no nexus between Allen's mental health status and his criminal history." *Id.* at 1175. The court nevertheless determined that Allen was not entitled to relief, because he had not shown that failure to present the evidence was constitutional error. *Id.* The court also found that the trial judge had considered any evidence of mental retardation and thus the issue had already been litigated. *Id.*

While it is important to note that *Allen* was decided several years after the completion of the Stephenson trial, it remains useful because it does not represent a change or shift in the law. Instead, it simply provided an application of the law that is particularly analogous to the factual situation in this case. The requirement of a nexus between specific prior bad acts of a defendant to the particular mitigation evidence being offered was not a new principle of law in the *Allen* decision. *See, e.g.*, *Brown v. State*, 577 N.E.2d 221, 232 (Ind. 1991) (noting that once an accused offers evidence of good character, the door is opened to evidence of specific misconduct in rebuttal). The usefulness stems from application of this principle in *Allen* to mental health mitigation evidence. As will be made clear, even though the Petitioner's counsel did not have the benefit of reading the *Allen* decision at the time of the Petitioner's trial, he still made the error of treating all potentially mitigating evidence as opening the door to the Petitioner's bad acts. As was the case at the time of the trial and as *Allen* makes abundantly clear, not all potentially mitigating evidence is created equal.

2.      ***Performance and Prejudice Under the* Strickland *Test***

Under *Strickland*, attorney performance is measured by a standard of reasonableness under prevailing professional norms. 466 U.S. at 687. A decision not to pursue a given avenue of investigation is to be reviewed for reasonableness considering all the circumstances. Defense attorneys are entitled to a strong presumption that they exercised reasonable professional judgment. *Id.* at 690–91. To establish prejudice, the Petitioner must show "that counsel's errors were so serious as to deprive the [Petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. This requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means "a probability sufficient to undermine confidence in the outcome."

*Id.* Notably, Indiana law allows the introduction of criminal history evidence to rebut mitigation evidence only if there is a nexus between the mitigation evidence and the criminal history. *Allen v. State*, 749 N.E.2d 1158, 1175 (Ind. 2001); *Brown v. State*, 577 N.E.2d 221, 232 (Ind. 1991) (noting that once an accused offers evidence of good character, the door is opened to evidence of specific misconduct in rebuttal). The Petitioner's arguments focus on trial counsel's lack of investigation into potential mitigating evidence, failure to present evidence that the Petitioner had once saved a drowning man, and failure to present evidence of the Petitioner's difficult childhood and mental health issues.

a.      *Lack of Investigation*

The Petitioner's complaints regarding a lack of investigation by trial counsel focus on counsel's failure to locate and present numerous witnesses who would have been willing to testify in support of the Petitioner's good character. The Indiana Supreme Court, however, determined that counsel chose not to present character evidence, fearing it would open the door to damaging criminal history evidence, which included a conviction for shooting a firearm at an occupied dwelling, an arrest for allegedly striking a man in the head with a shovel, and alleged physical abuse of his ex-wife. (PC 638.) The Petitioner asserts that additional investigation by trial counsel would have raised doubts regarding the precise events surrounding several of the incidents in the Petitioner's criminal history. Specifically, the Petitioner argues that a witness would have testified that the Petitioner's friend, and not the Petitioner himself, pulled the trigger in the case that led to a conviction in Virginia. Another witness would have testified that the Petitioner was threatened and provoked in the incident where he was charged with assault for striking a man with a shovel. It seems unlikely that such attempts to cast doubt on the validity of

the Petitioner's prior arrests and convictions would have persuaded the jury; the Petitioner did, after all, plead guilty to shooting a firearm into an occupied dwelling. And counsel cannot be faulted for concluding that presenting evidence of provocation in the bar fight incident would not be enough to outweigh the harm that would result from the jury learning of the incident in the first place. Therefore, counsel reasonably calculated that the admission of these prior bad acts into evidence would significantly and negatively affect the jury's view of the Petitioner, regardless of any efforts to minimize that effect.

The Indiana Supreme Court has held that when an accused offers evidence of his own character, he opens the door to rebuttal evidence regarding his character. *Allen*, 749 N.E.2d at 1173. Offering evidence of good character in the form of character witnesses would have opened the door to evidence of the Petitioner's bad character, which includes his prior bad acts and criminal convictions. Counsel made a tactical decision that the risk of opening the door to evidence of the Petitioner's bad character outweighed the potential benefit of presenting evidence of his good character traits. Counsel's tactical decisions are entitled to deference, as it is presumed that he acted in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. The Indiana Supreme Court concluded that counsel made a strategic choice not to present character evidence. That conclusion was reasonable as to any mitigation evidence that does in fact go to the Petitioner's good character.

b.      *Saving a Man from Drowning*

The Petitioner cites evidence that he saved a person's life and specifically contends that "there is no nexus between saving a person's life and criminal history." He argues this evidence would not open the door to criminal history. (Petitioner's Brief 71.) Such mitigation evidence

demonstrates the Petitioner's good character—particularly selflessness, a concern for the safety of others, and respect for human life. However, "evidence of prior crimes" is admissible when it is "relevant to rebut a trait of good character that the defendant placed into evidence." *Allen*, 749 N.E.2d at 1173. Therefore, if evidence of good character traits were placed into evidence, any criminal history relevant to those traits would be admissible. Because this Court is reviewing the Indiana Supreme Court's decision, the Petitioner must demonstrate that it was objectively unreasonable for the Indiana Supreme Court to conclude that counsel was reasonable not to present mitigation evidence for fear of opening the door to the Petitioner's criminal history.

The Petitioner's argument that no nexus exists between saving a life and criminal history is flawed. Evidence that the Petitioner saved a man's life tends to show the Petitioner's concern for the safety of others and willingness to risk his life to help someone in danger. The reason this evidence could have been effective in mitigation is precisely that it would have offered the jury a glimpse of these good character traits. Unfortunately for the Petitioner, his conviction for shooting a gun into an occupied dwelling is plausibly construed as evidence of corresponding bad character traits: indifference to the safety of others and a reckless attitude toward human life. Striking a man with a shovel also arguably relates to those same character traits. The Petitioner, by placing these character traits at issue, would likely have opened the door to evidence of his criminal history. The Indiana Supreme Court found that counsel's failure to present evidence that the Petitioner had once saved a drowning man was a reasonable strategic decision. This Court agrees.

c.      *Mental Health and Doctor Testimony*

The Petitioner alleges that the testimony of mental health experts could have been presented during the sentencing phase of the trial without opening the door to the Petitioner's criminal history. Specifically, the Petitioner cites to the testimony of Doctors Robert L. Smith and Michael Ryan, two doctors who examined the Petitioner at the request of postconviction counsel, and who testified at the postconviction proceeding. Trial counsel was aware of the Petitioner's difficult childhood, substance abuse, and other mental health issues, but elected not to present evidence of mental health or childhood trauma, citing both concern that it would open the door to criminal history, and also concern that a lengthy presentation would be counterproductive due to his perception that the jury was already bored, frustrated, and exhausted from the length of the trial. (PC 432). The Court is reviewing the Indiana Supreme Court's adjudication, which applied the *Strickland* test to evaluate whether counsel's assistance was ineffective.

The Indiana Supreme Court held that the Petitioner's counsel was not deficient for failing to introduce mitigation evidence due to concern that presenting such evidence would open the door to prior bad acts of the Petitioner. As noted above, Indiana law allows the introduction of a defendant's prior bad acts or criminal history to rebut mitigating evidence only if there is a nexus between the evidence introduced by the defendant and the criminal history or prior bad acts. *Allen*, 749 N.E.2d at 1175. In the Petitioner's case, the Indiana Supreme Court specifically noted the following:

> The postconviction court found that trial counsel's decision not to offer evidence of Stephenson's character was not unreasonable in view of the considerable negative evidence that Stephenson's character evidence would have produced. We agree.

*Stephenson II*, 864 N.E.2d 1022, 1045 (2007). But the Indiana Supreme Court did not specifically discuss the testimony of Doctors Smith and Ryan at the postconviction hearing regarding the mental health of the Petitioner.[2] The Indiana Supreme Court simply treated all of the potential mitigation evidence as character evidence. The postconviction court did the same. *Id.* (quoting the postconviction court's conclusion that "under all the circumstances of this case . . . counsel's decision not to open up Stephenson's background . . . cannot be said to be unreasonable or irrational, or ineffective assistance of counsel").

While the Indiana Supreme Court and the postconviction court both categorized the entirety of the potentially mitigating evidence in the Petitioner's case as character evidence that could have opened the door to criminal history, the Indiana Supreme Court's decision in *Allen* calls into question the reasonableness of this assessment with respect to at least some of the mitigating evidence that the Petitioner contends counsel should have offered. Specifically, the *Allen* court stated as follows:

> "The post-conviction court was incorrect when it concluded that this evidence could have opened the door to Allen's criminal history. There is no nexus between Allen's mental health status and his criminal history. To say that this evidence would open the door to evidence of prior convictions would improperly allow a jury to learn the details of a defendant's criminal history every time a defendant introduced a mental health diagnosis as mitigation evidence. *Cf. Roth v. State*, 550 N.E.2d 104, 106 (Ind.Ct.App. 1990) (holding that defendant's testimony that he was not "a crazy person" and that he had never been treated for a mental illness did not open the door to his criminal history), *transfer denied*.

*Allen*, 749 N.E.2d at 1175. The Indiana Supreme Court's reasoning in *Allen* entails that a diagnosis of a mental illness or disorder is not character evidence, and therefore does not open the door to criminal history unless reference to some aspect of a defendant's criminal history is necessary to explain the diagnosis or how it was reached.

---

[2] The Indiana Supreme Court did briefly address Dr. Smith's testimony, but only with respect to the Petitioner's statement to police, and not with respect to his childhood or mental health issues. *Stephenson II*, 864 N.E.2d at 1043.

Both the state postconviction court and the Indiana Supreme Court appear to have glossed over the question of whether at least some of the Petitioner's mitigation evidence could have been presented without opening the door to his criminal history. *Strickland* does clearly provide for a presumption that counsel exercised reasonable professional judgment in all significant strategic decisions. But in a death penalty case where no significant mitigation evidence was ultimately offered, it is unreasonable not to examine in detail the contention that none of the potential mitigation evidence known to counsel at the time could have been presented without opening the door to the Petitioner's criminal history.

The Indiana Supreme Court's denial of the Petitioner's ineffective assistance of counsel claim relies on the court's characterization of all of the Petitioner's mitigation evidence as character evidence. The fact that some—indeed most—of the mitigation evidence goes to the Petitioner's character does not mean that counsel's decision not to present any mitigation evidence at all was either reasonable or strategic. The Court well understands that the record of this trial is exceptionally voluminous, that the postconviction proceedings were also extensive, and that there were many claims to adjudicate. Nevertheless, the state courts' apparent assumption that testimony regarding the Petitioner's difficult childhood and mental health issues constituted character evidence that would have opened the door to criminal history is not only at odds with the Indiana Supreme Court's own decisions in *Allen* and *Roth*, but it also implicates the Petitioner's Sixth Amendment right under the Constitution of the United States to the effective assistance of counsel: a decision that counsel makes based on a misunderstanding of the law is neither strategic nor reasonable.

The *Strickland* presumption that counsel acted in the exercise of reasonable professional judgment is rebuttable, and counsel's alleged strategic decisions must be identified with

specificity before they can reasonably be judged by any standard, however deferential. Notably, the expert opinions of Doctors Smith and Ryan were not based on the Petitioner's moral character or criminal history, and with due care in tailoring the particular questions on direct examination, their expert opinions (or the opinions of other mental health experts) could have been offered and explained to the jury without any reference to the Petitioner's moral character or criminal history. Counsel thus could have presented evidence of the Petitioner's mental health issues and childhood trauma without opening the door to the Petitioner's criminal history. Failure to present any mitigating evidence out of concern for opening the door to criminal history must be regarded as deficient performance when there was mitigating evidence that in fact would not have opened that door. Nor can concern that the jury seemed bored and frustrated justify counsel's failure to take any measures at all to humanize the Petitioner in the eyes of the jury, where there were measures available that would not have opened the door to damaging rebuttal.

The Indiana Supreme Court's finding that trial counsel's performance was not deficient was an application of the performance prong of *Strickland*. That finding is reasonable with respect to the bulk of the mitigation evidence, but it is objectively unreasonable with respect to expert testimony regarding the Petitioner's mental health and childhood trauma. It was also unreasonable for the state courts to treat all of the potential mitigation evidence as character evidence, when some of the available mitigation evidence cannot reasonably be construed as evidence of the Petitioner's good character traits. The Court finds that counsel's failure to fully investigate and present evidence of the Petitioner's mental health and childhood trauma constitutes deficient performance under *Strickland*, because according to counsel it was based on the belief that the law would have allowed the state to rebut an expert mental health diagnosis

with evidence of the Petitioner's criminal history—a belief that was, and is, objectively mistaken.

An ineffective assistance of counsel claim can succeed, however, only if the Petitioner shows both that his counsel's performance was deficient and that the deficient performance was prejudicial. To show prejudice, the Petitioner must demonstrate a reasonable probability that, but for his counsel's errors, "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 696. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

The Indiana Supreme Court was correct to conclude that there was a legitimate strategic reason not to present any evidence of the Petitioner's good character traits. It could reasonably be argued that the better strategic move would have been to bite the bullet and allow the jury to hear the good, even if it meant they would also hear the bad. But to the extent that counsel's fear of opening the door to criminal history was reasonable, this is the sort of choice that the Court will not second-guess. Therefore, the Court will consider only the mitigation evidence that was not character evidence.

The bulk of the available mitigation evidence would have opened the door to the Petitioner's criminal history. But the question relating to the prejudice prong of the *Strickland* standard is whether hearing only that the Petitioner had a difficult childhood, a substance abuse problem, and a mental disorder would have altered the balance between the aggravating and mitigating factors sufficiently to undermine confidence in the death sentence. Such evidence tends to address whether the Petitioner is truly to blame for his actions. Considering, however, the amount of evidence before the jury and the fact that this mitigation evidence does not indicate that the Petitioner is any less dangerous than the triple murder would suggest, the Court

finds that this type of mitigation evidence would not have altered the outcome. Therefore, the Petitioner's ineffective assistance claim is denied.

**B.      Ineffective Assistance of Counsel: Failure to Object to Stun Belt**

The Petitioner also claims that trial counsel was ineffective for failing to object when the Petitioner was forced, without a particularized determination of necessity, to wear a stun belt during his capital murder trial. This claim is before the Court on remand from the Seventh Circuit Court of Appeals, and this Court's task is limited to determining whether the Petitioner was prejudiced at the sentencing phase of his capital trial.

In Ground VII of his Petition, the Petitioner contends that his trial counsel was ineffective for failing to object when the court ordered the Petitioner to wear a stun belt at his trial. The Court previously granted summary judgment in favor of the Petitioner on the ground that his counsel's failure to object to the stun belt constituted ineffective assistance. *Stephenson III*, 2009 WL 1886081 (N.D. Ind. 2009). The Seventh Circuit Court of Appeals reversed, holding that the Petitioner had not been prejudiced with respect to the guilt phase of the trial, even though the parties did not dispute that his counsel's failure to object constituted deficient performance. *Stephenson IV*, 619 F.3d 664 (7th Cir. 2010). The Seventh Circuit left open the question of whether the stun belt prejudiced the Petitioner at the sentencing phase of his trial.

**1.      *Background and Standards of Review***

The Petitioner argues that this Court is free to consider *de novo* the question of prejudice at sentencing, while the State contends that the AEDPA requires this Court to defer to the Indiana Supreme Court's adjudication, which the State argues was reasonable. The AEDPA provides that a state court's adjudication of the merits of a habeas petitioner's claim will not be

disturbed unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is contrary to clearly established federal law "if it applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the United States Supreme Court] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court adjudication involves an unreasonable application of clearly established federal law "if the state court applies [the United States Supreme Court's] precedents to the facts in an objectively unreasonable manner." *Id.*

The Indiana Supreme Court held that the Petitioner was not prejudiced by counsel's failure to object to the stun belt, because any objection would have been properly overruled. *Stephenson II*, 864 N.E.2d at 1041. Even though the Seventh Circuit reversed the Court's grant of summary judgment in favor of the Petitioner, it did not endorse, defend, or defer to the Indiana Supreme Court's reasoning. Rather, even in reaching the same result as the Indiana Supreme Court, the Seventh Circuit panel supplied its own reasoning with respect to prejudice, and even explicitly pointed out that the Indiana Supreme Court relied on an inadequate basis for its conclusion that the Petitioner was not prejudiced by counsel's failure to object. *Stephenson IV*, 619 F.3d at 666–67. This Court will therefore review *de novo* the question of prejudice at the sentencing phase.

**2.** *The Performance Prong of the* **Strickland** *Test*

The Indiana Supreme Court concluded that it was deficient performance for counsel not to object to the use of the stun belt during both the guilt and sentencing phases of the Petitioner's

trial. *Stephenson II*, 864 N.E.2d at 1041. This Court agreed, and the Seventh Circuit panel took it as a given since it was not in dispute. The Seventh Circuit panel noted that the Petitioner's argument does not rest directly on the three cases he cites as clearly established law, but instead relies on the proposition that the use of the stun belt "was sufficiently questionable that, as federal and state law then stood, an objection to his being forced to wear it during his trial without a showing that he presented a security risk would, or at least should, have been granted, and so counsel was deficient in failing to make the objection." *Id.* at 667. Neither party disputes that counsel's failure to object was deficient performance.

3.      *The Prejudice Prong of the* **Strickland** *Test*

The Indiana Supreme Court ruled that it was deficient performance on the part of the Petitioner's trial counsel not to object to the use of the stun belt at trial, but that the Petitioner was not prejudiced, because such an objection would have been overruled by the trial judge, and the trial judge's decision to overrule the objection would have been properly affirmed upon appeal. *Stephenson II*, 864 N.E.2d at 1041. The Court previously held that the Indiana Supreme Court's adjudication of this claim was not entitled to deference pursuant to 28 U.S.C. 2254(d)(1), because it involved an unreasonable application of *Strickland's* prejudice prong. The Court relied on the Seventh Circuit's interpretation of the United States Supreme Court's decisions in *Illinois v. Allen*, 397 U.S. 337 (1970), *Estelle v. Williams*, 425 U.S. 501 (1976), and *Holbrook v. Flynn*, 475 U.S. 560 (1986), in concluding that at the time of the Petitioner's trial, clearly established Supreme Court precedent prohibited trying a defendant in restraints without a particularized justification. *Stephenson III*, 2009 WL 1886081, at *7 (citing *Wrinkles v. Buss*, 537 F.3d 804 (7th Cir. 2008)). Specifically, the Court wrote that the Seventh Circuit's decision in *Wrinkles v.*

31

*Buss* "unambiguously holds that at the time of Stephenson's trial in 1996-97, *Allen, Estelle,* and *Holbrook* were clearly established law prohibiting the use of stun belts without particularized reasoning." *Id.* (quoting *Wrinkles*, 537 F.3d at 814 (stating that "it was well established [at the time of Wrinkles's trial in 1995] that a trial court could not restrain a criminal defendant absent a particularized justification," and that "[*Allen, Estelle,* and *Holbrook*] make clear that particularized reasoning must support any decision to restrain a defendant")).

In its order reversing this Court's previous Order and remanding for consideration of the Petitioner's other claims, the Seventh Circuit panel stated that "[i]t could be argued that, read together, *Holbrook*, *Estelle*, and *Allen* had by 1996 established a rule determined by the Supreme Court (and therefore a ground of federal habeas corpus) against unnecessary visible restraints that was broad enough to include the stun belt." *Stephenson IV*, 619 F.3d at 668. The Seventh Circuit panel questioned the Indiana Supreme Court's reasoning that counsel's failure to make a properly doomed objection was deficient performance, but accepted this premise and moved on to consider any potential prejudice. *Stephenson IV*, 619 F.3d at 667–70. Ultimately, the Seventh Circuit remanded the issue of any prejudice during the penalty phase to this Court. *Id.* at 674. Here, the State does not simply argue that the Indiana Supreme Court's adjudication of the prejudice prong is entitled to deference under the AEDPA.

As the Seventh Circuit pointed out, there is an argument that the Indiana Supreme Court's conclusion that an objection would have been properly overruled is contrary to the United States Supreme Court's holdings in *Allen*, *Estelle*, *and Holbrook*. *Stephenson IV*, 619 F.3d at 668; *Wrinkles*, 537 F.3d at 814 (stating that "[*Allen, Estelle,* and *Holbrook*] make clear that particularized reasoning must support any decision to restrain a defendant"). Given that the

stun belt was in fact seen by multiple jurors,[3] and given that a stun belt is no less a restraint than shackles (and no less prejudicial if observed by jurors), this seems the most natural application of that trio of cases to the facts of the Petitioner's case. Even more importantly, the Indiana Supreme Court's analysis applied the wrong standard: the question should not have been whether the trial court would have overruled an objection or whether an appellate court would have affirmed. The question should have been whether the law in effect at the time of the Petitioner's trial entitled the Petitioner to be tried without the stun belt had his counsel objected to its use, and, if so, whether there is a reasonable likelihood that the jury would have acquitted the Petitioner but for the use of the stun belt.[4] Applying the wrong standard is one way in which a state court may be said to have applied clearly established federal law, as determined by the United States Supreme Court, in an objectively unreasonable manner. *Payton*, 544 U.S. at 141.

Had the Petitioner's counsel objected, there would have been a hearing to determine whether the use of the stun belt was permissible in the Petitioner's case. The Indiana Supreme Court concluded that, had a hearing on the matter been held, there were facts more than sufficient to form the basis for a particularized finding that the Petitioner could lawfully be tried in restraints. *Stephenson II*, 864 N.E.2d at 1040–41. If that were the case, then the Petitioner certainly would not be able to show that he had been prejudiced by unprofessional errors committed by his counsel. However, as the Court previously pointed out, and as the Seventh Circuit panel agreed, the facts relied upon by the Indiana Supreme Court relate solely to the crime itself, and not to the defendant's demeanor or conduct after he peacefully and promptly surrendered himself to police. *Stephenson IV*, 619 F.3d at 666–67 (stating that, apart from the

---

[3] It is undisputed that multiple jurors were in fact aware of the stun belt, and several of them submitted sworn affidavits to that effect. *See Stephenson II*, 864 N.E.2d at 1039 (observing that "at least several of [the Petitioner's] jurors were aware of the belt.").
[4] The Indiana Supreme Court did not discuss separately any prejudicial effect the stun belt may have had at the sentencing phase.

facts of the crime itself, "there was no reason to think that the defendant would have been likely to try to flee the courtroom or cause any other disturbance during the trial"). As the Seventh Circuit panel put it, "[t]he factors relied upon by the [Indiana Supreme C]ourt to uphold the use of the stun belt were insufficient in light of the case law both then and now." *Id.* at 667. The Seventh Circuit panel went on to conclude, however, that even if the Petitioner had successfully objected to the use of the stun belt, there was not a reasonable probability that the outcome of the guilt phase of his trial would have been different. With respect to this claim, therefore, all that is left for the Court to determine is whether the use of the stun belt undermines confidence in the sentence.

To show prejudice, the Petitioner must demonstrate a reasonable probability that, but for his counsel's errors, "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 696. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The Court finds that there is not a reasonable probability that, but for counsel's failure to object to the stun belt, the Petitioner would have been sentenced to life in prison rather than death.

Important to this analysis is the role of future dangerousness in capital jury deliberations. It is well settled that visible restraints tend to cause a defendant to be perceived as especially dangerous. The question here is whether, considering the totality of the circumstances, there is a reasonable probability that the stun belt (and thus counsel's failure to object) made the difference between a death sentence and a life sentence. The Petitioner is correct to point out that future dangerousness is always on the mind of the capital juror, even when the State does not raise the issue.[5] But even in the literature discussing the importance of future dangerousness in capital jury

---

[5] *See, e.g.*, John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev. 397 (2001) (Drawing on the findings of the Capital Jury

deliberations, it is noted that the single most important factor is the nature of the crime itself.

Here, the crime at issue was the brutal murder of three people, which in itself is strong evidence of the Petitioner's dangerousness in the eyes of the same jury that had just found, beyond a reasonable doubt, that the Petitioner committed the crime. Whatever influence the stun belt might have had on the jury's perception of the Petitioner's future dangerousness, it was not nearly as great as the influence that the brutal and heinous nature of the crime had on the jury's perception of the Petitioner's future dangerousness. The Court is confident that if the Petitioner had not been forced to wear the stun belt, it would not have altered the jury's conclusion that the aggravating circumstances outweighed the mitigating circumstances, and that a death sentence was warranted. *See Strickland*, 466 U.S. at 696. The Court concludes that there is not a reasonable probability that the stun belt made the difference between a life sentence and a death sentence. The Petitioner's argument does not attack his eligibility for the death penalty.

Accordingly, the Court denies this ground for habeas relief.

**B.      Juror Misconduct**

The Petitioner alleges two instances of juror misconduct. First, one juror learned during the trial that the sister of one of the victims taught his children in Sunday school. The juror failed to inform the trial court after becoming aware of the relationship. The second claimed instance of misconduct occurred when extraneous information about an alleged prior bad act of the Petitioner reached several jurors. The jurors in question did not disclose this to the court. The Indiana Supreme Court adjudicated both claims on the merits in favor of the State. The Petitioner

---

Project, which found that jurors discussed questions relating to future dangerousness in their deliberations such as the need to keep the convicted from killing again and the likelihood of the convicted later being released, even in cases where the state did not raise the issue of future dangerousness at all.)

contends that the adjudication of these claims involved an unreasonable application of *Remmer v. United States*, 347 U.S. 227 (1954).

With respect to the first claimed instance of juror misconduct, the Indiana Supreme Court concluded that, although the juror in question should have informed the court upon becoming aware of his relationship to the victim's sister, this relationship was rather tenuous and was not indicative of bias. In addition, there is no indication that the juror lied during *voir dire,* or even that he knew the victim's sister personally, as opposed to merely being acquainted with her. The Indiana Supreme Court's decision is entitled to deference, and will not be disturbed unless it involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. The Petitioner contends that the burden should have been on the State to prove that the jury's deliberations were not poisoned by bias arising from the juror's acquaintance with the sister of one of the victims. In support of this, he cites *Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005), in which the Seventh Circuit held that when any juror is exposed to extraneous information "of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury," an inquiry must be conducted to determine whether the extraneous information had a prejudicial effect. *Wisehart*, 408 F.3d at 326. How much inquiry is necessary depends on the likelihood that the extraneous information prejudiced the defendant. *Id.* But *Wisehart* is distinguishable from the Petitioner's first claim of juror misconduct, because it involved a claim of juror bias arising from the introduction of extraneous information bearing directly on the question of the defendant's guilt or innocence of the charged offense. In such a case the burden is properly placed upon the State to show that the extraneous information did not influence the jury's deliberations. *Wisehart*, 408 F.3d at 326. Because this alleged instance of extraneous information relating to

juror misconduct did not involve the Petitioner's guilt or innocence, there was no presumption of prejudice, and the postconviction court was correct to deny the claim based on the lack of evidence of actual bias. The postconviction court's inquiry was appropriate to the circumstances because the juror in question was deposed, and the deposition was entered into evidence at the postconviction hearing. *See* Pet. Ex. 59. Given the tenuous nature of the relationship between the juror and the victim's sister, this inquiry was sufficient. The Indiana Supreme Court appropriately reviewed the postconviction court's conclusion for clear error and, finding none, appropriately affirmed the denial of the Petitioner's claim.

The second claim of juror misconduct is more troubling, as it involved the introduction of extraneous information to multiple jurors. Moreover, the extraneous information related to a prior bad act allegedly committed by the Petitioner—that he once struck a man with a shovel during a fight outside a bar in Newburgh, Indiana. Because, this information was not admitted into evidence at trial, and would not have been admissible if offered by the State, it is clearly extraneous. Furthermore, information about a defendant's prior bad acts is generally inadmissible precisely because of the fear that such information would be far more prejudicial than probative. Fed. R. Evid. 404(b)(1). The Court must examine this claim of juror misconduct under *Wisehart*.

The Indiana Supreme Court adjudicated this claim on the merits and first noted that "jurors' consideration of evidence not in the record violates the defendant's right to confrontation." *Stephenson II*, 864 N.E.2d at 105. The court then explained that not all constitutional error requires reversal, and that where an error is harmless beyond a reasonable doubt the verdict will stand. *Id.* It also noted that under Indiana case law, whether or not to overturn a verdict due to the jury's consideration of extraneous information requires analysis of a

case's specific facts. *Id.* The court then set out to determine "whether the jury contact with outside information has so prejudiced the defendant that he was denied a fair trial." *Id.* This is essentially the same question federal law directs appellate courts to consider. The court determined that there was no evidence that any juror was predisposed to convict. *Id.* But the analysis did not stop there. The record also indicates that the exchange among the jurors was brief, that a juror who overheard the comments admonished the offending jurors that they were not permitted to discuss the subject (and that the offending jurors heeded this admonishment), and that none of the jurors who heard it shared it with the full jury. *Id.* The fact that the full jury did not hear about the shovel incident is relevant only to the extent that it affects the scope of a reasonable inquiry. Only those jurors exposed to extraneous information need be evaluated for bias arising from that exposure. That alone does not resolve the claim, however, because every defendant is entitled to a jury "*no member of which* has a bias induced by extraneous matter." *Wisehart*, 408 F.3d at 327 (emphasis added).

There are two questions before this Court. First, the Court must decide whether the scope and depth of the inquiry conducted by the postconviction court (and endorsed by the Indiana Supreme Court) were reasonable under the circumstances. Second, the Court must determine whether the inquiry was reasonably thorough and whether the finding of harmless error was objectively unreasonable based on the facts uncovered by that inquiry.

The postconviction court heard from most of the jurors through affidavits or depositions. Juror Bryant's affidavit makes no mention of any knowledge of the bar fight in Newburgh, Indiana. Pet. Ex. 46. Juror Reiff's affidavit mentions that she overheard one juror mention the bar fight to another juror, and that a third juror quickly admonished them to stop discussing the bar fight immediately, which they did. Pet. Ex. 47. Juror Hills's affidavit does not indicate that

she was aware of the bar fight during the trial. Pet. Ex. 48. Juror Branson could not recall whether he had heard about the bar fight during the trial or afterwards. Pet. Ex. 58 at 12. Juror Fox was certain he did not hear about the bar fight until after the trial. Pet. Ex 59 at 20. Juror Faulkenberg did not learn of the bar fight during the trial. Pet. Ex. 60 at 9. Juror Holland did not know about the bar fight during the trial. Pet Ex. 61 at 11–12. Juror Wadsworth was unaware of the bar fight during the trial. Pet. Ex. 62 at 8. Juror Young was not aware of the bar fight during the trial, but learned of it afterward. Pet. Ex. 63 at 13–14. Juror McCammish was not asked about the bar fight during her deposition, and gave no indication she was aware of it. Pet. Ex. 64. The Indiana Supreme Court concluded that the postconviction court did not clearly err in finding that the extraneous information did not play any material role in deliberations. *Id.*

The Indiana Supreme Court's adjudication of this claim is entitled to deference on habeas review, and will not be overturned unless it involved an objectively unreasonable application of clearly established federal law or an objectively unreasonable determination of the facts. While the Indiana Supreme Court based its analysis on state law, the standard it applied required a showing that the extraneous information did not influence the jury's deliberations. Such a showing also satisfies the requirements of federal law. The Indiana Supreme Court's acknowledgement of the "harmless beyond a reasonable doubt" standard suggests that the burden was on the State to show harmlessness. It appears that the postconviction court, having heard from the jurors through affidavits and depositions entered into evidence at the hearing, was satisfied that the extraneous information did not influence the verdict. The Indiana Supreme Court then concluded that the postconviction court had not clearly erred in its investigation or its conclusion. There is a basis in the record for concluding that the error was harmless, and the Indiana Supreme Court noted this. The juror who overheard the discussion about the bar fight

immediately admonished the offending jurors that they were not to talk about such things. This admonishment was heeded, and there is no indication that the subject was ever broached again. From the fact that many of the jurors had never heard of the bar fight until they were asked about it during the course of the investigation into juror bias, it can be inferred that the bar fight was not discussed during deliberations. The extraneous information could still have altered the verdict, but only if at least one of the jurors exposed to the information would have steadfastly refused to convict but for that exposure. In a case where the extraneous information at issue did not directly concern the ultimate question before the jury, the state courts reasonably concluded that the extraneous information did not undermine confidence in the result of the trial. Considering the circumstances, the postconviction court's investigation was sufficiently thorough to satisfy *Remmer.*

While any material extraneous information reaching jurors is cause for serious concern, the findings of the state courts indicate that they were convinced after a reasonable investigation that the error was harmless. This case is distinguishable from *Hall v. Zenk*, 692 F.3d 793 (7th Cir. 2012), in which the state court's decision was based, not on a reasonably thorough investigation, but instead on the erroneous legal conclusion that the defendant bore the burden of proving prejudice on direct appeal. Here, the state court conducted a reasonable investigation into potential juror bias and concluded that the extraneous information was not reasonably likely to have influenced the verdict. In *Hall*, the Seventh Circuit explained that when engaging in such an inquiry the federal constitution requires a state court

> to limit the questions asked the jurors to whether the communication was made and what it contained, and then, having determined that communication took place and what exactly it said, to determine—without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion—whether there is a reasonable possibility that the communication altered their verdict.

*Hall*, 692 F.3d at 806 (quoting *Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 917 (7th Cir. 1991)).

It appears that the state court's juror bias investigation in this case complied with *Hall's* prescription. The court asked the jurors whether they heard the extraneous information, and, if so, when they heard it and what exactly they heard. The jurors were not asked how, if at all, the information affected their deliberations. In noting the harmless error standard, the Indiana Supreme Court recognized that the verdict could not stand if there were a reasonable probability that the extraneous information influenced the jury's deliberations. The Court reads the Indiana Supreme Court's opinion as concluding that the postconviction court's investigation yielded sufficient evidence of harmlessness that confidence in the result of the trial was not undermined. No further investigation was possible, given the limits the Indiana (and the Federal) Rules of Evidence place on jurors impeaching their own verdicts. *See* Ind. R. Evid. 606(b); Fed. R. Evid. 606(b). Unlike in *Hall*, the state courts did not decide this matter based on an absence of evidence and the presence of a dispositive burden of proof. The Court cannot say that the state court's adjudication of this claim was an objectively unreasonable application of *Remmer*, nor can the Court say that the adjudication was based on an objectively unreasonable determination of the facts. While the evidence of the Petitioner's guilt was not overwhelming, this case is distinguishable from *Wisehart* and *Hall* in that the extraneous information that reached the jury did not pertain to the crime for which the Petitioner was on trial. In light of the appropriate investigation that the state court conducted into the matter and the support that investigation provides for their conclusion, the state court was not objectively unreasonable in concluding that there is not a reasonable likelihood "that the communication altered [the jury's] verdict." *See Hall*, 692 F.3d at 806.

Even if the state courts had erroneously placed the burden on the Petitioner to prove that the extraneous information prejudiced his case, and even if they had cited the burden of proof as the sole basis for denying the Petitioner's claim, the Petitioner would still bear the very same burden of showing prejudice on habeas review. *See Hall*, 692 F.3d at 805. The investigation into juror bias was reasonably thorough, uncovered no evidence of actual bias, and provided reason to believe that the extraneous information did not alter the verdict. The Petitioner's juror misconduct claim is therefore denied.

## C.       Sufficiency of the Evidence

The Petitioner argues that the evidence against him is insufficient to support his conviction. The Court begins by discussing the standard on direct appeal for challenges to evidentiary sufficiency, because the State contends that the Petitioner did not fairly present this claim to the Indiana Supreme Court on direct appeal. The Court concludes that the Petitioner did fairly present his federal claim; that the Indiana Supreme Court adjudicated that claim on the merits; that this adjudication is entitled to deference under 28 U.S.C. § 2254(d)(1); and that the adjudication was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

### 1.       Standard on Direct Appeal

In a criminal trial, proof beyond a reasonable doubt is "an essential of Fourteenth Amendment Due Process." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)). Therefore, a state prisoner who challenges the sufficiency of the evidence supporting his conviction has stated a federal constitutional claim. *Id*. at 321–22, 324. To

succeed in a challenge to the sufficiency of the evidence, an appellant must show, based on the record evidence, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. at 319. *Jackson* directs the reviewing court to consider all of the evidence in the light most favorable to the State, to draw inferences in favor of the State, and to resolve conflicting inferences in favor of the State. *United States v. Beniach*, 825 F.2d 1207, 1212 (7th Cir. 1987) (citing *United States v. Moya*, 721 F.2d 606, 610 (7th Cir. 1983)).

The *Jackson* standard is designed to impinge on the jury's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319. Because juries observe the demeanor of trial witnesses and courts of appeals do not, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *see also United States v. Bailey*, 444 U.S. 394, 414–15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story"). In applying the *Jackson* standard, an appellate court will not consider any new evidence not presented at trial, because the question is whether any rational trier of fact could have convicted "*upon the record evidence adduced at the trial*." *Jackson*, 443 U.S. at 324 (emphasis added).

The test for evidentiary sufficiency under Indiana law is worded a bit differently than the federal standard, but the two are substantially the same. Indiana law requires that there be "substantial evidence of probative value which would permit a reasonable trier of fact to find the existence of each element of the offense beyond a reasonable doubt." *Bowen v. State*, 478 N.E.2d 44, 46 (Ind. 1985). Under both Indiana law and federal law, the ultimate question is whether any reasonable trier of fact could have found all elements of the offense beyond a reasonable doubt.

## 2.     *Procedural Default and Fair Presentment*

The State argues that this claim is barred by procedural default, because the Petitioner never fairly presented it to the Indiana Supreme Court on direct appeal. To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). "Fair presentment requires the petitioner to give the state courts a meaningful opportunity to pass upon the substance of the claims later presented in federal court." *Id.* (quoting *Rodriguez v. Scillia*, 193 F.3d 913, 916 (7th Cir. 1999)). In the interests of federal-state comity, both the operative facts and controlling law must be put before the state courts. *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001) (citing *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001); *Boyko*, 259 F.3d at 788).

In determining whether a federal claim was fairly presented to the state courts, "the task of the habeas court . . . is assessing, in concrete, practical terms, whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *Ellsworth*, 248 F.3d at 639 (quotation marks and internal citations omitted). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). There are four (4) factors to consider in determining whether a federal claim was fairly presented to the state courts: "(1) whether the petitioner relied on federal cases that engage in a constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* at 815.

The State argues that the Petitioner presented only a state claim, and not a federal claim, to the Indiana Supreme Court. The State emphasizes the fact that most of the cases cited by the Petitioner, and most of the Petitioner's argumentation, revolve around a state law rule called the "incredible dubiosity" rule, which allows a state appellate court to reweigh the credibility of a witness whose testimony is "inherently improbable, coerced, equivocal, or wholly uncorroborated." *Davis v. State*, 658 N.E. 2d 896 (Ind. 1995). But the Petitioner also "relied on federal cases that engage in a constitutional analysis." *Anderson*, 471 F.3d at 815. He argued on direct appeal to the Indiana Supreme Court that the evidence presented at his trial was insufficient to support his conviction, citing *Jackson v. Virginia*, 443 U.S. 307 (1979), a frequently cited United States Supreme Court opinion that engages in extensive constitutional analysis. (Pet'r's Appellate Br. 9.) The Petitioner pointed out that the federal and Indiana constitutions both require proof beyond a reasonable doubt. *Id.* Then, after attacking the evidence against him for approximately twenty pages, he concluded by claiming that the evidence against him was insufficient to support a conviction under either the state or the federal standard, citing the Supreme Court's *Winship* decision as well as several Indiana state cases. *Id.* at 31. The Petitioner's emphasis on the state law "incredible dubiosity" rule is not surprising, given that the central evidence in the case was the testimony of two witnesses whose credibility the Petitioner has vigorously contested at every opportunity. Indiana has a special rule explicitly allowing appellate courts to reweigh the credibility of "incredibly dubious" witnesses. Under federal law there is no such explicit rule, and "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup*, 513 U.S. at 330. While it does not follow that no court applying federal law can ever reweigh witness credibility, the Petitioner recognized that the state law argument was more likely than the federal law argument to persuade the Indiana Supreme

Court to revisit the witnesses' credibility. He allocated the limited space in his brief accordingly. It does not follow that he failed to present the federal claim.

In addition to citing the appropriate federal precedent, the Petitioner also "framed the claim in terms so particular as to call to mind a specific constitutional right." *Anderson*, 471 F.3d at 815. The Petitioner claimed that the evidence was insufficient to support his conviction, citing the United States Supreme Court's opinion in *Jackson v. Virginia*. Variations on the phrase "sufficiency of the evidence," in the context of a challenge thereto, immediately call to mind the requirement that a defendant not be convicted of a crime absent proof of all elements beyond a reasonable doubt. Proof of guilt beyond a reasonable doubt has been explicitly recognized by the United States Supreme Court as a requirement of Fourteenth Amendment Due Process since at least 1970. *See In re Winship*, 397 U.S. at 364 ("Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). A challenge to evidentiary sufficiency, in addition to being a longstanding and well-recognized federal constitutional claim, is also a common claim on direct appeal. The Indiana Supreme Court was thus "sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *Ellsworth*, 248 F.3d at 639.

It is difficult to imagine what more the State believes was necessary to fairly present the federal claim. The factual substance of the state and federal claims is identical. The Petitioner was attacking the credibility of witness testimony, and he therefore focused most of his attention on a state law rule explicitly permitting the reassessment of the jury's credibility determinations in rare cases. However, he also asserted that the evidence against him failed to meet the

minimum standard under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and he cited to appropriate federal legal authority in making that assertion. Thus, both the operative facts and the controlling federal law were put before the state court. Whatever the merits of his federal challenge to the sufficiency of the evidence, the Petitioner succeeded in fairly presenting the claim on direct appeal.

3.      *The Indiana Supreme Court's Adjudication of the Claim*

Having concluded that this claim was fairly presented to the state court, the next question is whether the Indiana Supreme Court adjudicated the claim on the merits; it did. Therefore, that process is entitled to deference under the AEDPA, which provides that a state court's adjudication of the merits of a habeas petitioner's claim will not be disturbed unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Indiana Supreme Court's adjudication of this claim was not contrary to clearly established federal law, as determined by the United States Supreme Court. The Indiana Supreme Court, after summarizing the Petitioner's challenge to the evidence against him, found that "the jury could have reasonably concluded beyond a reasonable doubt that [the Petitioner] committed the burglary and the three murders." *Stephenson I*, 742 N.E.2d at 499. While the Indiana Supreme Court cited only to state precedents, the state law standard is substantially the same as the federal standard, and the state and federal claims share the same set of operative facts. In concluding that a reasonable jury could have convicted the Petitioner of the charged offenses, the Indiana Supreme Court adjudicated both the state claim and the federal claim on the merits. While the Indiana Supreme Court did not cite *Jackson* explicitly, it applied the correct

standard in rejecting the Petitioner's claim. Therefore the adjudication was not contrary to clearly established federal law, as determined by the Supreme Court of the United States.

Furthermore, the Indiana Supreme Court did not apply the *Jackson* standard "in an objectively unreasonable manner." *Payton*, 544 U.S. at 141. The Indiana Supreme Court discussed both the evidence and the Petitioner's challenges to that evidence. It concluded that witnesses Funk and Mossberger were not "incredibly dubious" witnesses for purposes of the "incredible dubiosity" rule, despite the presence of several inconsistencies in their testimony. It pointed out that the jury was made aware of these inconsistencies, and that there was also some circumstantial evidence pointing to the Petitioner's guilt. *Stephenson I*, 742 N.E.2d at 497. The court also noted that the Petitioner's own statements to police and the testimony of his alibi witnesses also contained inconsistencies. *Id.* at 499. The jury had the opportunity to observe all witnesses who testified, and the state court declined to reweigh the credibility of their testimony. The decision not to apply the "incredible dubiosity" rule was one of state law, and is therefore not subject to review by this Court. As a matter of federal law, which has no explicit "incredible dubiosity" rule, the decision not to impinge upon the jury's credibility determinations was not objectively unreasonable, because such determinations are generally beyond the scope of review in claims challenging the sufficiency of the evidence.

The Indiana Supreme Court applied the correct standard in adjudicating the Petitioner's claim on the merits, and its application of that standard was not objectively unreasonable in light of clearly established federal law. The Petitioner's sufficiency of the evidence claim is therefore denied.

**D.** **Freestanding Actual Innocence Claim**

The Petitioner asserts his actual innocence in a freestanding claim. Whether such a claim is cognizable is a question that the United States Supreme Court has, to date, explicitly avoided deciding. However, the Petitioner points to case law that, in his view, strongly indicates that the United States Supreme Court would find the claim to be cognizable were it to reach the question. The State contends that the Petitioner should not be procedurally allowed to make such a claim, and that, even if allowed, the claim lacks merit. This Court will follow the United States Supreme Court in assuming without deciding that the claim is cognizable, because the Court finds that the new evidence presented by the Petitioner is insufficient to surmount the extraordinarily high bar that the Petitioner must clear to prevail on this claim.

**1.** *Is a Freestanding Innocence Claim Cognizable?*

Every time the United States Supreme Court has been asked to decide whether a freestanding actual innocence claim is cognizable, it has assumed in the affirmative without deciding. *See, e.g.*, *In re Davis*, 557 U.S. 952, 952 (2009) (transferring original habeas petition asserting a freestanding innocence claim to a district court with instructions to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence"); *House v. Bell*, 547 U.S. 518, 555 (2006) (finding that the petitioner had met the gateway standard for excusing procedural default, but that he had not made a sufficient showing for a freestanding claim of innocence and assuming without deciding that the claim was cognizable); *Hererra v. Collins*, 506 U.S. 390, 417–19 (1993) (assuming without deciding that a freestanding innocence claim is cognizable, and concluding that the petitioner's evidence in support of his claim of innocence fell "far short

of that which would have to be made in order to trigger the sort of constitutional claim we have assumed, *arguendo*, to exist"). In the most recent of these cases, *In re Davis*, the district court, upon transfer from the United States Supreme Court, decided that a freestanding innocence claim is cognizable, though it also found that the petitioner in that case had failed to establish his actual innocence. The district court explained its decision to reach the question of cognizability despite finding that the petitioner could not establish actual innocence:

> When courts find a *Herrera* claim insufficient after lengthy factfinding regarding innocence, it is usually because the extensive factfinding was already necessary to determine a *Schlup* claim, and the *Herrera* claim can be resolved by reference to the *Schlup* determination. *See House v. Bell*, 547 U.S. 518 (2006). By contrast, this Court has already expended significant resources taking in evidence specifically regarding Mr. Davis's *Herrera* claim. It will have to expend even more resources to review the evidence and determine the merits of the *Herrera* claim, which is not facially insufficient even though it fails upon close examination. The expenditure of those resources can, and should, be avoided if this claim is not cognizable. Accordingly, the Court declines to dodge the question that is squarely before it.

*In re Davis*, 2010 WL 3385081, at *37 n.15 (S.D. GA. Aug. 24, 2010) (internal parallel citations omitted). In deciding that the claim is cognizable, the district court held that the execution of one who is demonstrably innocent would violate the Eighth Amendment prohibition of cruel and unusual punishment, even if the conviction followed a fair trial and all appeals had been exhausted. The district court made use of the following hypothetical scenario:

> A defendant is convicted of the murder of his child after a full and fair trial, and he is then sentenced to death. Ten years later, the defendant discovers the "murdered" child has been safely living on a remote island, conclusively disproving defendant's guilt. The defendant then goes before the state with his living child, but is denied relief and the state prepares to move forward with his execution. The challenge under these circumstances is whether, in spite of the truly persuasive proof of innocence, the state may proceed with the execution without violating the Eighth Amendment of the United States Constitution.

*Id.* at *40 n.24. The district court noted the decision in *Robinson v. California*, 370 U.S. 660 (1962), in which the United States Supreme Court held that any punishment is disproportionate where the convicted is without culpability. The district court also conducted a thorough analysis

of more recent Eighth Amendment jurisprudence before concluding that a freestanding innocence claim is cognizable.

While the Court finds the reasoning of the district court in *Davis* persuasive, there is not a similar justification for reaching the issue of cognizability in this case. The Court need not conduct a lengthy evidentiary hearing on the question of actual innocence, because in this case all of the new evidence is already in the record, including that which the Indiana Supreme Court decided was not genuinely new. Because of this, and because the Court finds that the Petitioner has not clearly established his actual innocence, the Court will assume without deciding that a freestanding actual innocence claim is cognizable.

2.      ***Standard of Proof***

The United States Supreme Court has recognized a claim of actual innocence as a "gateway" for excusing procedural default, allowing a federal habeas court to hear claims that would otherwise be barred if the Petitioner can present new reliable evidence, not available at trial, demonstrating "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The Supreme Court has also noted that the standard of proof for a hypothetical, freestanding innocence claim would have to be higher than the standard for a gateway claim. *House*, 547 U.S. at 555. The United States Supreme Court's instructions to the district court in *Davis* should also be accorded significant weight in determining the proper standard. The Supreme Court ordered the district court to determine whether the petitioner could "clearly establish" his innocence. *Davis*, 557 U.S. at 952. Also of import to this Court's analysis, the Supreme Court noted in *Schlup* that "newly presented evidence may indeed call into question the credibility of witnesses presented at

trial. In such a case, the habeas court may have to make some credibility assessments." *Schlup*, 513 U.S. at 330. The reviewing court should focus its inquiry "on the likely behavior of the trier of fact," had the trier of fact been aware of the new evidence as well as the evidence actually presented at trial. *Id.* The Supreme Court recently clarified that a court considering an actual innocence gateway claim should not count unjustifiable delay by the petitioner "as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). Taking all of this guidance together, the Petitioner's freestanding actual innocence claim can succeed only if the totality of the evidence, old and new, clearly shows that the Petitioner is actually innocent of the crime for which he is incarcerated.

**3.**     *The New Evidence*

All of the new evidence the Petitioner offered at the postconviction hearing was in the form of witness testimony. The Petitioner has presented new testimony from a number of witnesses, some of whom testified at trial and some of whom did not. Ten of these witnesses gave testimony at the postconviction hearing that implicated Guy James "Jimmy" Knight. Two other witnesses (who did not testify at the postconviction hearing, but who were later deposed) pointed the finger at Brian Mossberger, one of the State's key witnesses. The Petitioner's trial counsel presented witnesses to the jury who testified that Knight had implicated himself in the three murders. The jury apparently did not credit this testimony, and none of it is more than suggestive of Knight's involvement in the murders.

a.    *Danyel Renfro*

Danyel Renfro was a friend of Brandy Southard, one of the victims. Renfro's testimony at trial implicated Jimmy Knight in the murders. She testified that a few days before the murders, Southard had told her that Knight had threatened to shoot Southard over a $1,500.00 debt, saying that "[her] time was coming." (PC 285.) At the postconviction hearing, Renfro reiterated that testimony, and went on to say that Knight was "not right in the mind," and that he scared her. (*Id.* at 287.) When asked to explain why he scared her, Renfro stated that she had seen him "go off," striking his girlfriend, Becky Beasley, repeatedly before being restrained. (*Id.* at 287–88.)

At the time of the murders, Renfro was living with Herschel Siefert, an associate of Knight. (*Id.* at 285.) Renfro also testified at the postconviction hearing that Troy Napier had come to Siefert's house in the days following the murders, looking nervous and insisting he had nothing to do with them despite not having been asked about the murders. (*Id.* at 286.) Renfro testified that Herschel Siefert had "give[n] [her] advice" about testifying, though a hearsay objection was sustained with respect to the contents of the communication. (*Id.*) She was also asked whether "Herschel Siefert [had given] any indication that he knew about these homicides, these murders, before they happened," to which she responded in the affirmative. (*Id.*) Once again, a hearsay objection was sustained as to the contents of any such communications. (*Id.* at 287.) When asked if the Petitioner's trial counsel had asked her the same questions that postconviction counsel asked her at the hearing, Renfro could not remember clearly, stating that at the time of the murders and the trial she "was drugged out real bad," though she had since stopped using drugs. (*Id.* at 289–90.)

b.    *David Stephenson*

David Stephenson, the Petitioner's brother, testified at the postconviction hearing. He did not testify at the trial. Much of Stephenson's testimony had to do with the Petitioner's childhood and substance abuse issues, and has already been recounted *supra*. However, Stephenson also gave testimony that is relevant to the Petitioner's actual innocence claim. Stephenson testified that he saw the Petitioner on March 28, 1996, and that the Petitioner told Stephenson at that time that Mossberger was in possession of the Petitioner's SKS rifle, which neither party disputes was the murder weapon. (PC 628.) Stephenson testified that he knew this conversation occurred on March 28, but that he was not sure about the exact date of the murders. (*Id.*) (March 28 was in fact the day of the murders.)

c.    *Rebecca Beasley*

Rebecca Beasley testified at the Petitioner's trial. At the time of the trial, she was living with Herschel Siefert. (PC 292.) Beasley testified that she learned of the triple homicide from Detective Marvin Heilman, who came to Jimmy Knight's house. (*Id.*) She also testified that she has lived with Knight, though she was not sure if she was living with him at the time of the murders. (*Id.* at 294.) Beasley and Knight have two children together. (*Id.*) Asked whether she knew that Knight "broke the law sometimes," she testified that "everyone was aware of it" because Knight was "stupid." (*Id.*) Asked if Knight ever said anything to her that would indicate his involvement in the triple homicide, Beasley answered, "No." (*Id.*)

d.      *Becky Francis*

Becky Francis testified at the Petitioner's trial. At that time her name was Becky Johnson. (PC 327.) Francis had recently been arrested on drug charges when she testified at trial. (*Id.*) She testified at the postconviction hearing that she was still suffering from withdrawal at the time of her trial testimony. Francis testified at the Petitioner's trial that, a few days before the murder, Jimmy Knight had told Herschel Siefert to avoid Warrick County. (*Id.* at 328.) She also testified that Siefert had bragged about lying to police, saying he had passed a polygraph test. (*Id.*) Francis also testified that Knight had approached her brother, Ronnie Story, and asked him if he wanted to go on a hit with Knight. (*Id.*) Francis also testified at trial that Knight had told her that the victims had intercepted some drugs and that examples were going to be made. (*Id.*) She said that Knight owed Siefert money, and that Siefert told Knight to take care of the issue of the missing drugs. (*Id.*) Francis testified that her understanding was that the drugs were at Troy Napier's house, that Knight went to Napier's house and the drugs were not there, and that because Napier was in jail at the time, Knight concluded that Brandy Southard must have been responsible. (*Id.*)

At the postconviction hearing, Francis also testified about Jimmy Knight, saying he was a "lunatic" and a "very mean, nasty, devious person." (*Id.* at 331.) She also described how Knight would regularly beat her friend, Christina Baker, when Baker dated Knight. (*Id.*) Francis also testified that when she told Baker that she thought Knight was involved in the murders, Baker immediately left, and an angry Knight showed up soon after. (*Id.* at 334.) Francis testified that Knight did not say anything indicating he killed the victims, but was simply angry that she was saying she thought he did it. (*Id.*) Francis testified that Knight told her that anyone telling people

he committed the murders would "watch every single person they care about die around them." (*Id.* at 334.)

e.    *Brandi Martin*

Brandi Martin testified at the Petitioner's trial. Martin was friends with the victims, and testified that Southard told her Troy Napier, her boyfriend, owed Knight money. (*Id.* at 345.) Napier was in jail at the time. She testified that Southard told her that Knight was calling her at Napier's trailer and threatening her life. (PC 340.) Martin also testified that Southard was afraid, because she didn't have the money Knight was demanding. (*Id.* at 341.) She also mentioned that Southard told her that someone had been lurking around Napier's trailer, and that Southard thought it was Knight. (*Id.*)

Martin was also friends with victim Kathy Tyler. She testified that Tyler told her she was afraid, and that she thought she was being followed. (*Id.* at 342.) Martin testified that Tyler had said she wanted to go back to Illinois, where she and her husband, victim Jay Tyler, had lived before moving to Indiana. (*Id.* at 342.)

f.    *Carl Bruner*

Carl Bruner testified at the Petitioner's trial. Bruner knew Knight, and testified that Knight had once pawned a gun to him for $50.00. (PC 317.) He also testified that Knight later came back to get the gun, saying he needed to give it to Detective Heilman. (*Id.*) Bruner testified further that he gave Knight a ride to court within days of the murders, and that Knight said something along the lines of "they went too far," or "someone went too far." (*Id.* at 319.) Asked

if Knight ever said anything that indicated he might have had something to do with the murders, Bruner answered, "Oh no. No. He never did tell me that." (*Id.*)

g.      *Terri Greenlee West*

Terri Greenlee West did not testify at trial. *Stephenson II*, 864 N.E.2d at 1053. West and Becky Beasley were friends and also roommates at the time of the murders. (PC 376.) West testified that Knight came to her home on the morning of March 29, 1996. (*Id.* at 377.) West testified that "Knight's appearance was very disoriented and he was very upset." (*Id.*) West said that Knight asked to speak to Beasley outside, and that Beasley came back inside, told West that three people had been murdered, gathered a few of her things, and left with Knight. (*Id.* at 384.) West testified that Knight never said anything at all to her about the murders, much less anything suggesting his involvement. (*Id.*) It is unclear from the record whether the Petitioner's trial counsel ever interviewed West.

h.      *Christina Baker Barenfanger*

Christina Baker Barenfanger knew Knight from a prior romantic relationship that had lasted several years. (PC 296.) She testified at the postconviction hearing that she had known Knight for close to twenty years. (*Id.*) Barenfanger described Knight as "nuts," saying, "[h]e's got a problem." (*Id.*) She testified that he was "often" physically abusive, and that he was also mentally abusive. (*Id.*) Barenfanger testified that she had asked Knight whether he had anything to do with the murders when she visited him in jail. (*Id.* at 297.) She testified that he winked and nodded. (*Id.*) Barenfanger testified that she believed he was serious, though she also testified that

when she asked him about it again later, he denied involvement. (*Id.* at 299.) She said that to her knowledge Knight had never murdered anyone. (*Id.*)

Barenfanger also testified that Herschel Siefert had said something to her that made her think Siefert might have been involved, but she was not asked exactly what he said that led her to suspect his involvement. (*Id.* at 302.) Barenfanger was not asked whether she was ever contacted by the Petitioner's trial counsel.

i.      *David Kifer*

David Kifer did not testify at the Petitioner's trial. Kifer was in jail with Knight during the trial, and the two were in the same cell block. (PC 307–08.) Kifer described Knight as "moody" and "very unpredictable." (*Id.* at 307.) Kifer testified that the Petitioner's trial was on the television in the jail. (*Id.* at 308.) Kifer testified that Knight had expressed concern that Knight's clip was left in the murder weapon. (*Id.*) He also testified that Knight called himself a "cold-blooded killer" in what Kifer perceived to be an attempt to intimidate him. (*Id.* at 309.) In addition, Kifer testified that Knight told him of the murders, "I know [the Petitioner] didn't do that, but he's hit." (*Id.* at 310.) Kifer explained that Knight frequently used the word "hit" in that context, and that to say that someone was "hit" meant that he was stuck with what happened.

j.      *Chad Adams*

Chad Adams did not testify at either the trial or the postconviction hearing, because his existence as a potential witness did not come to the attention of police until after the postconviction trial court had already denied the petitioner's request for postconviction relief. Police learned of Adams when other inmates with whom he had been in jail alerted police that

Adams had claimed to have knowledge of the murders for which the Petitioner was convicted. At that time, the Petitioner's motion to correct error had already been filed with the postconviction court. That court agreed to delay ruling on the motion to correct error until after the new evidence was investigated. Several new witnesses were deposed, and Adams was given a polygraph examination.[6] After reviewing this evidence, the postconviction trial court denied the motion without comment.

Adams told police he knew Mossberger as an acquaintance, through Adams's friend Donald Goodman. (PC App. 762.) Adams told police that on the day of the murders, he and Goodman had worked on a car together at Mossberger's house. (*Id.*) Adams said that around five or six o'clock in the evening, several people arrived for a bonfire party. (*Id.*) The Petitioner was among them. (*Id.*) Adams said that he did not know most of the people who had arrived, and that he and Goodman continued working on the car. (*Id.*) Mossberger went back and forth between the bonfire and working on the car. (*Id.*) Adams stated that he left the party around 8:30 PM to pick up his wife from work. (*Id.*) He said he was gone about 30 to 45 minutes, and that he continued working on the car after he returned. (*Id.*) Adams said that a truck drove past the house at around 10:30 PM, and that he thought it was a red full-sized pickup truck. (*Id.* at 763.) Adams said he heard Mossberger say, "I'm going to get that son of a bitch," at which point Mossberger left in his own truck to follow. Adams said he saw the Petitioner walk back to the bonfire after Mossberger left. Adams told police that he and his wife then went to get more beer, and that when they returned, Goodman came out front and said that they needed to leave immediately. (*Id.*) Adams said that he went inside to put the beer in the freezer, and that Goodman told him again they needed to leave, and that Mossberger and the Petitioner were in the bathroom. (*Id.*)

[6] These depositions, as well as Adams's polygraph report, can be found in the Postconviction Appendix to the Brief of the Petitioner/Appellant ("PC App.").

Adams said that he then heard Mossberger say, "I got them on Youngblood road." (*Id.*) Adams stated that he, his wife, and Goodman all left the party about five minutes later. (*Id.*) Adams told police that the Petitioner was at Mossberger's house at all times Adams was there that evening. (*Id.*)

Adams stated that Goodman came to Adams's home the next day, and that they talked about the previous night. (*Id.*) Adams said his wife and his mother were at his house at this time. (*Id.*) Adams told police that Goodman said he thought Mossberger had killed someone the previous night, and that Goodman told Adams not to talk about it to anyone. (*Id.*) Adams told police that Goodman had looked upset and nervous, and that he believes Goodman moved to Michigan to get away from the whole situation. (*Id.*) Adams said that fear was what had kept Adams silent. (*Id.*)

The polygraph report notes three specific questions asked of Adams. First, he was asked whether he actually heard Mossberger say he was going after the truck. Adams answered, "Yes," and the polygraph detected "no significant indications of deception." (*Id.* at 764.) Adams was asked whether he actually saw Mossberger drive off after the truck. He answered, "Yes," and the polygraph again detected "no significant indications of deception." (*Id.*) Adams was then asked whether he actually heard Mossberger say that he "got him on Youngblood Road." Adams answered, "Yes," and this answer scored as "truthful." (*Id.*)

k.      *Carla Smith*

Carla Smith is Chad Adams's mother. Like Adams, Smith did not testify at the trial or at the postconviction hearing; the need for her testimony did not arise until Chad Adams had come forward. Smith testified at her deposition that Donald Goodman came to Adams's house the day

after the murders, and that she knew this because she was there. (PC App. 753.) Smith testified that Goodman was acting scared and talking about a man named "Brian." (*Id.* at 754.) She said Goodman talked about seeing Brian return to his (Brian's) house on Sharon Road. (*Id.*) Smith said that Goodman said Brian had come home "bloody." (*Id.*) She testified that she recalled "something about a knife or gun and it was bloody and [Goodman] said that this Brian had threatened him and he was scared to death and he said I'm leaving the state." (*Id.*) Smith said that she was going to call the police when she realized this had to do with the triple murder that was in the news at the time, but that Goodman had told her to "keep [her] mouth[] shut because this guy might come after [her]." (*Id.* at 755.) Smith said that she had not come forward earlier because she was afraid. (*Id.* at 756.) She said that she came forward when she did because "they told us we had to be here." (*Id.* at 757.) She said that her son, Chad Adams, had told her only that Goodman had denied coming over to their house after the murders. (*Id.*) She said that this was not true, and that Goodman did come to the house. (*Id.*)

l.      *Donald Goodman*

Donald Goodman was deposed after the postconviction hearing had been conducted, because it was only after police interviewed Chad Adams that anyone became aware of the need to depose Goodman. Goodman's cousin, Frances Harper, was married to Chad Adams at the time of the murders. Goodman and Harper were good friends as well as cousins, and Goodman got to know Adams through Harper, though according to Goodman he and Adams never grew particularly close.

Goodman's account differs rather substantially from those of Adams and Smith. Goodman testified at his deposition that he was "definitely not [at Mossberger's] that night." (PC

App. 709.) He said that around the time of the murders (which occurred on a Thursday night), he was working six nights a week, Monday through Saturday. (*Id.* at 709–10.) He stated that "unless it happened on a Sunday, I was working." (*Id.*) Goodman told police he had been to Mossberger's house on a few occasions, but never with Adams. (*Id.* at 724.) Goodman also stated that he never discussed the murders with Chad Adams or Carla Smith, and that he did not go to Adams's house the day after the murders. (*Id.* at 714.) He said that he thought Adams was seeking attention by coming forward now, saying that Adams "loves attention" and "likes to look like he's big and bad." (*Id.* at 727.)

m.    *Frances Harper*

Frances Harper is Chad Adams's ex-wife and Donald Goodman's cousin. Harper and Adams were married at the time of the murders. Harper testified in her deposition that she had stopped at Mossberger's house with Adams on the night of the murders, and that she had gone inside for a few minutes to use the restroom. (PC App. 745.) She then returned to the car. (*Id.*) Harper testified that she was not feeling well that night, as she was pregnant and "due any time." (*Id.*) She said there were "a couple" of people at Mossberger's house, but she had no recollection of a party or a bonfire. (*Id.* at 747.) She had no recollection of Donald Goodman being at Mossberger's house that night, though she also testified that she "didn't pay any attention to who was there." (*Id* at 745–46.) Harper did recall that Goodman moved back to Michigan shortly after the murders. (*Id.* at 746.) Harper also testified that she did not talk about the murders with Goodman, Adams, and Smith on the day following the murders. (*Id.*) She testified that she never spoke to anyone about that night. (*Id.*)

**4.** *The Substantive Actual Innocence Claim*

The state postconviction court was not impressed by the Petitioner's new evidence, nor was the Indiana Supreme Court, which held that the Petitioner's new evidence did not undermine confidence in the outcome of his trial. *Stephenson II*, 864 N.E.2d at 1054. However, the Indiana Supreme Court based this conclusion on consideration of only some of the evidence that the Petitioner contended was new; it refused to consider the testimony of Adams, Smith, Goodman, and Harper, finding that the Petitioner did not show that he had exercised due diligence in attempting to discover the evidence in time for use at trial. *Id.* at 1053.

This Court does not defer to the Indiana Supreme Court's decision to disregard this testimony. Whether evidence is "new" for purposes of Indiana Code §35-50-2-9(k) is a different question from whether or not it is "new" for purposes of a hypothetical federal freestanding actual innocence claim—or for purposes of a gateway actual innocence claim. The Indiana Supreme Court's decision not to consider the testimony was based on a state law requirement that a petitioner offering new evidence after conviction make a showing that he exercised due diligence in trying to find the evidence before his conviction. *Stephenson II*, 864 N.E.2d at 1053 (applying Indiana Code §35-50-2-9(k)). But even assuming the Petitioner failed to exercise diligence in locating Adams, a failure of diligence in uncovering new evidence is the sort of defect that can be overcome on habeas review by a sufficiently persuasive showing of actual innocence. *See Herrera*, 506 U.S. at 429 (White, J., concurring) (". . . I assume that a persuasive showing of "actual innocence" made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of [the] petitioner in this case."); *McQuiggin*, 133 S. Ct. at 1928 ("[A] federal habeas court, faced with an actual-innocence gateway claim, should count

unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown.")

The Court concludes that if a freestanding actual innocence claim is cognizable, then the evaluation of such a claim should include any relevant evidence that was not heard by the jury. To be sure, when a new witness comes forward (or an old witness recants) at the eleventh hour, a court should consider such suspicious timing in assessing the reliability of that testimony. But as the Supreme Court recently held, if the late timing of an actual innocence claim is due to an unjustifiable delay on the petitioner's part (which is one sort of failure to exercise diligence), then that is but one factor weighing against finding the new evidence reliable. *McQuiggin*, 133 S. Ct. at 1928. Moreover, *McQuiggin* involved a gateway innocence claim that had been filed after the statutory deadline imposed by the AEDPA had passed. If lack of diligence can be excused by a showing that a petitioner is probably innocent, then it follows that a showing that a petitioner is *clearly* innocent must also be sufficient. The Court will therefore consider all evidence that is relevant to the question of actual innocence, including all of the evidence presented at trial, all of the evidence from the postconviction hearing that was not presented at trial, and also the deposition testimony from the new witnesses discovered after the postconviction hearing but before the postconviction trial court denied the Petitioner's motion to reconsider. If the totality of the evidence clearly established the Petitioner's actual innocence, then the Indiana Supreme Court's exclusion of some of the "new" evidence from consideration under Indiana law for lack of due diligence would be no obstacle to relief.

Unfortunately for the Petitioner, the totality of the evidence in this case does not clearly establish his actual innocence. It would be a rare case in which new evidence consisting solely of witness testimony could be sufficiently clear and compelling that a petitioner who was originally

convicted upon legally sufficient evidence would be entitled to relief on a freestanding actual innocence claim, which places an even greater burden on a petitioner than does a gateway innocence claim. *See McQuiggin*, 133 S. Ct. at 1928 (cautioning that tenable gateway claims of actual innocence are very rare). The new evidence in this case is not sufficiently clear or conclusive to merit relief on a hypothetical freestanding actual innocence claim. The jury did in fact hear testimony suggesting that Knight was the real killer, and they knew that Mossberger was in possession of the murder weapon following the murders. Nevertheless, the jury convicted the Petitioner of the murders. And as the Court has already concluded, the jury did so upon legally sufficient evidence.

The only new testimony that might have given the jury real pause is that of Adams. Adams passed a state-administered polygraph, and there is persuasive precedent suggesting that polygraph results may be considered by a habeas court hearing an actual innocence claim. *See Schlup v. Delo*, 912 F.Supp. 448, 455 (E.D. Mo. 1995) (considering polygraph results in determining witness credibility in an actual innocence claim). However, as the United States Supreme Court has observed, "there is simply no consensus that polygraph evidence is reliable," and "the scientific community remains extremely polarized about the reliability of polygraph techniques." *United States v. Scheffer,* 523 U.S. 303, 309 (1998). Federal circuits also disagree about how to regard polygraph results. The Seventh Circuit generally leaves the admission or exclusion of polygraph results to the discretion of the district court. *United States v. Lea*, 249 F.3d 632, 638 (7th Cir. 2001) (citing *United States v. Robbins*, 197 F.3d 829, 844 (7th Cir. 1999)). In contrast, the Fourth Circuit maintains a *per se* rule that polygraph evidence is inadmissible for bolstering or impeaching witness credibility. *United States v. Prince-Oyibo*, 320

F.3d 494, 501 (4th Cir. 2003) ("Our post-*Daubert* precedents foreclose our abandonment today of this Circuit's *per se* rule.").

An actual innocence claim requires the Court to make a probabilistic determination, based on the totality of the evidence, of what a reasonable and properly instructed jury would do. *Schlup*, 513 U.S. at 329. The fact that Adams passed a polygraph examination is insufficient to support a finding that the Petitioner has clearly established that no reasonable jury would have believed Mossberger's and Funk's testimony over Adams's. The problem is not just the lack of scientific consensus regarding the reliability of polygraph results. Also problematic is the fact that Adams's testimony conflicts not only with Mossberger's testimony, but also with the Petitioner's own statement to police, and with other new testimony that the Petitioner asks the Court to consider in deciding this claim (most of which, if credited, would tend to implicate Knight, not Mossberger). For instance, Adams says that Donald Goodman was with him at Mossberger's house on the night of the murders, but Goodman denies that he was there. Goodman also insists he did not go to Adams's house the day after the murders, as Adams and Smith testified. Frances Harper was with Adams both on the night of the murders and the next day at Adams's house. She does not recall seeing Goodman either at Mossberger's house on the night of the murders or at Adams's house the next day. In addition, Harper denies ever discussing the events of the night of the murders with anyone, again directly contradicting the testimony of Adams and Smith.

While the jury might have chosen to believe Adams over Mossberger and Funk, the totality of the evidence does not clearly establish the Petitioner's actual innocence. And while the United States Supreme Court has indicated that new evidence can sometimes make it necessary for a habeas court to reweigh witness credibility in evaluating an actual innocence claim, the

extent of the reweighing that would be necessary in order to grant this petition is not justified by the Petitioner's new evidence. Here, new testimony conflicts with old testimony, and new testimony conflicts with other new testimony, and both old and new testimony conflict with the Petitioner's own statement to police. Attempting to reweigh this jumble of conflicting testimony would be a futile endeavor, the result of which would at best be no more reliable than the result of the original trial. All of the key witnesses appear to have (at least) arguable credibility issues. However, the Court cannot conclude based on this record that the Petitioner has clearly established his actual innocence.

**E.      Right to Confrontation, Prosecutorial Misconduct, and Cumulative Error**

The Petitioner contends that he was denied his Sixth Amendment right to confront and cross-examine the witnesses against him when the trial court declined to admit evidence that one of the chief witnesses against him had been convicted of armed robbery seventeen years prior to the Petitioner's trial. He also argues that the prosecutor committed misconduct by insinuating to the jury that the Petitioner was involved in drug trafficking, despite offering no evidence that this was the case; that the trial court erred in refusing to grant the Petitioner's motion to declare a mistrial following those comments; and that the cumulative effect of these claimed errors was to deny him the fair trial to which every defendant is entitled. The Indiana Supreme Court held that the trial court's exclusion of the stale convictions did not violate the Petitioner's Sixth Amendment right to confrontation, or his right to a fair trial. It also held that the prosecutor's comments did not rise to the level of misconduct, and that the trial court's admonishment to the jury was sufficient to cure the defect.

1.      *Procedural Default*

The State contends that the Petitioner's cumulative effect argument is barred by procedural default, because in the state court he did not argue cumulative effect specifically, but instead argued separately that each of the two issues here raised is sufficient by itself to merit relief. In deciding whether the cumulative effect of multiple errors amounts to a harmful constitutional deprivation, a habeas court will consider first whether there were two or more constitutional errors. *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000). Without multiple errors, there can be no accumulation of harmful effects. In deciding whether the cumulative effect of multiple errors was to render a petitioner's trial fundamentally unfair, "[t]he court will consider . . . plain errors or errors which were preserved for appellate review." *Id*. at 825. If multiple errors are found, the court will then decide whether, considering the entire record, "the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Id.* at 824.

The question of the nature and scope of cumulative error analysis is the subject of a circuit split. The Sixth Circuit treats cumulative error claims as separate claims that are procedurally defaulted on habeas review unless first asserted explicitly in state court. *Abdur'Rahman v. Colson*, 649 F.3d 468, 472 (6th Cir. 2011). The Sixth Circuit does except claims of multiple *Brady* violations and claims of multiple instances of ineffective assistance of counsel from this general requirement of explicitly asserting cumulative effect in state court. *Id.* at 472–73. In contrast the Fifth Circuit, in an *en banc* opinion, considered on the merits a cumulative error argument that had not been raised in the state courts (though each of the constituent claims had been properly preserved). *Derden v. McNeel*, 978 F.2d 1453, 1456–57 (5th Cir. 1992). The Seventh Circuit's approach in *Alvarez* likewise appears to require only that

the individual claimed errors be either plain or properly preserved. While it does not appear that procedural default was raised in *Alvarez* as a bar to the petitioner's cumulative error argument, *Alvarez* is mandatory authority that provides a formula for evaluating cumulative effect arguments in this circuit. Accordingly, the Court will follow the analysis set forth in that decision, which means reaching the merits of the Petitioner's cumulative effect argument.

In finding that neither the exclusion of the prior convictions nor the refusal to grant a mistrial constituted error, the Indiana Supreme Court effectively decided this claim on the merits. If the Petitioner had explicitly argued cumulative effect before the Indiana Supreme Court, the analysis would have been complete as soon as the Indiana Supreme Court found that there were not multiple errors. And in rejecting each of the claims whose alleged cumulative effect is at issue, the Indiana Supreme Court did in fact find that there were not multiple errors. That adjudication is entitled to deference under 28 U.S.C. 2254(d)(1), and the Indiana Supreme Court was not unreasonable in determining that the claimed errors constituting the Petitioner's cumulative error argument were not errors.

## 2.    *Exclusion of the Stale Robbery Convictions*

The Petitioner claims that the trial court's exclusion of evidence of witness Brian Mossberger's three armed robbery convictions, which were 17 years old at the time of the Petitioner's trial, violated the Petitioner's rights under the confrontation clause of the Sixth Amendment. While federal habeas corpus is not normally used to review questions about the admissibility of evidence, *Estelle*, 502 U.S. at 72, a federal habeas court does have an independent duty to determine whether the application of state evidence rules to a particular case violates the Constitution. *Sussman v. Jenkins,* 636 F.3d 329, 353 (7th Cir. 2011) (citing *Jones v.*

*Cain*, 600 F.3d 527, 536 (5th Cir. 2010)). The rules of evidence may not be applied mechanistically to defeat the ends of justice, but rather must be applied so as to meet fundamental standards of due process. *Chambers v. Mississippi*, 410 U.S. 284, 313 (1973). However, a defendant's right to confront and to cross-examine "is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 309. In applying their evidentiary rules, states must carefully weigh the interests served by a rule against any limitation of a particular defendant's constitutional rights. *Rock v. Arkansas*, 483 U.S. 44, 56 (1987). In addition, to be entitled to relief on this claim the Petitioner must show not only that there was a constitutional error, but also that the error had "a substantial and injurious effect or influence on the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993).

The Indiana Rules of Evidence provide that a witness's prior criminal convictions are admissible under certain circumstances and for certain purposes. Prior convictions for certain enumerated felonies, including robbery, are generally admissible for the purpose of impeaching a witness's credibility, provided the conviction is not more than ten years old. *See* Ind. R. Evid. 609(a) and 609(b). Older convictions may be admissible, but only if the trial court determines, upon a showing by the proponent, that the probative value of the stale conviction substantially outweighs its prejudicial effect, and provided also that the proponent gives the adverse party sufficient written notice of intent to use such evidence. Ind. R. Evid. 609(b). The proponent's argument for probative value must be supported by specific facts and circumstances. *Scalissi v. State,* 759 N.E.2d 618, 624 (Ind. 2001). The decision to admit or exclude such evidence lies within the discretion of the trial judge and is reviewed for abuse of that discretion. Implicit in the ten-year time limit of Indiana Evidence Rule 609(b) is the general principle "that older

convictions have little bearing on the current state of a defendant's credibility." *Id.* at 625. Rule 609(b) draws the line at ten years, but also provides an exception to the general rule by allowing evidence of older convictions upon a showing by the proponent that the probative value of a particular stale conviction remains great enough substantially to outweigh the danger of unfair prejudice. Both the general rule and the exception are designed to protect the integrity of the fact-finding process, which is a legitimate state interest. The AEDPA limits the Court's authority to determining whether the Indiana Supreme Court failed to conduct the required balancing of interests, or whether it conducted the required balancing in an objectively unreasonable manner. *Payton*, 544 U.S. at 141.

In deciding the Petitioner's claim that the trial court erred in excluding evidence of Mossberger's stale robbery convictions, the Indiana Supreme Court noted that the Petitioner bore the burden of showing that the probative value of the prior convictions substantially outweighed its prejudicial effect. *Stephenson I*, 742 N.E.2d at 486 (citing *Schwestak v. State*, 674 N.E.2d 962, 964 (Ind. 1996)). While the court acknowledged that Mossberger's testimony was important to the State's case, it rejected the Petitioner's contention that Mossberger's credibility was a dispositive factor. *Id.* at 485. The court reasoned that the import of Mossberger's testimony was to corroborate the testimony of Dale Funk, who testified that he was with the Petitioner at the time of the murders and that the Petitioner was the one who shot and killed the three victims. *Id.* at 486. The court acknowledged that "a Sixth Amendment issue is raised when a defendant is prohibited from cross-examining a crucial witness on an area of his credibility." *Id.* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). But the court also noted that the Sixth Amendment "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (citing

*Van Arsdall*, 475 U.S. at 479 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985))). The trial

court conducted a hearing to determine whether the probative value of the stale convictions was

sufficient to merit exception from the general rule that stale convictions are inadmissible, and it

ruled that the probative value of the convictions was insufficient to merit exception from the

general ten year time limit imposed by Indiana Evidence Rule 609(b). (R. 1966–67.) The Indiana

Supreme Court agreed. Rather than merely relying on the deferential nature of the "abuse of

discretion" standard, the court explicitly held that Mossberger's stale robbery convictions were

of insufficient probative value to outweigh their likely prejudicial effect. *Stephenson I*, 742

N.E.2d at 486. The court also pointed out that the Petitioner's counsel was not prevented from

conducting an extensive cross-examination of Mossberger, consisting of approximately 500

pages of trial record. *Id.* at 486–87. This cross-examination focused "in some extended detail"

upon Mossberger's credibility, *id.* at 487, and the Petitioner acknowledged in his brief to the

Indiana Supreme Court that the cross-examination did effectively "expose some of Mossberger's

evasiveness, selective memory, and lies." *Id.* (quoting Pet'r's Appellate Br. at 33). The Indiana

Supreme Court concluded that the Petitioner was not denied the opportunity to meaningfully and

effectively cross-examine Mossberger. *Id.*

      The Indiana Supreme Court's adjudication is entitled to deference under 28 U.S.C. §

2254(d)(1), and it was neither contrary to, nor an objectively unreasonable application of, the

United States Supreme Court's decision in *Chambers*. In *Chambers*, the defendant was denied

any opportunity either to cross-examine a witness whose testimony was clearly and severely

damaging to the defendant, or to call to the stand friends of that witness, each of whom was

prepared to testify to a separate occasion on which the witness had confessed to committing the

very crime with which the defendant was charged. *Chambers*, 410 U.S. at 308–10. The

confessions were especially important because the evidence pointed to a single perpetrator. *Id.* at 297. The state court ruling denying the defendant the right to cross-examine the witness was based on a state evidence rule providing that parties may cross-examine only adverse witnesses. The state courts limited the definition of an "adverse" witness to witnesses called by the adverse party, regardless of the actual content of the witness's testimony. The United States Supreme Court reversed and remanded, reasoning that "the right to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State." *Id.* at 297–98. The Supreme Court held that allowing such a "technicality" to determine the substantive rights of the defendant amounted to a denial of the defendant's right to a fundamentally fair trial. *Id.* at 298.

The facts of *Chambers* bear little resemblance to the Petitioner's case. The Petitioner was not denied the opportunity to cross-examine Mossberger. In fact, he was able to cross-examine Mossberger at considerable length and in considerable depth. The only limitation of his right to cross-examination was the refusal of the trial court to admit evidence of Mossberger's prior robbery convictions, which preceded the Petitioner's trial by seventeen years. The Petitioner had the opportunity to participate, and did participate, in a hearing to determine whether the stale convictions should be admitted pursuant to an exception to the general time limit imposed by Indiana Evidence Rule 609(b)—an exception that exists precisely to prevent the sort of mechanistic, technicality-driven application of the rules that the United States Supreme Court condemned in *Chambers.* The Indiana Supreme Court reasonably concluded that the exclusion of this evidence did not amount to a deprivation of the Petitioner's right to cross-examine Mossberger on the issue of credibility. Mossberger's commission of three robberies in 1979 is at best only slightly probative of his propensity to tell the truth under oath in 1996. The likely

prejudicial effect could reasonably be said to outweigh this slight probative value. Indeed, if clearly established federal law *required* the admission of Mossberger's stale convictions, then the general ten-year limit of Indiana Evidence Rule 609(b) would become the exception, and the exception the rule. The Indiana Supreme Court dutifully weighed the competing interests and concluded—reasonably—that in this case Mossberger's stale convictions were properly excluded.

**3.**     *Prosecutorial Misconduct*

The Petitioner asserts that the prosecutor repeatedly insinuated, in the presence of the jury, that the Petitioner was involved in drug trafficking or some other illegal means of supporting himself. Although the Indiana Supreme Court acknowledged, as did the trial court, that the prosecutor had made inappropriate comments, it nevertheless declined to conclude that the trial court abused its discretion in denying the Petitioner's motions for a mistrial. The Petitioner argues that the Indiana Supreme Court's determination of the facts was unreasonable, giving this Court grounds to grant his Petition under 28 U.S.C. 2254(d)(2), and also that the Indiana Supreme Court unreasonably applied the United States Supreme Court's precedent in *Donnelly v. Dechristoforo*, 416 U.S. 637 (1974), giving the Court grounds to grant his petition under 28 U.S.C. 2254(d)(1). The Court concludes that the Indiana Supreme Court did not ignore or unreasonably apply clearly established federal law in determining that the trial court did not abuse its discretion in declining to declare a mistrial.

The Petitioner alleged numerous instances of misconduct before the Indiana Supreme Court, but focuses here on two instances. The first instance occurred when the Petitioner was cross-examining a state witness. The Petitioner asked the witness about the witness's use of

"crank" (an illegal drug), and the prosecutor objected, saying, "[u]nless I get to ask these kind of questions concerning the Defendant . . . I do not know that this line of questioning has any relevance." *Stephenson I*, 742 N.E.2d at 483 (quoting R. at 23, 212–13). The Petitioner objected to this comment. The trial judge sustained the objection, admonished the jury to disregard the prosecutor's comment, and granted the Petitioner's request for individual *voir dire* on the matter to ensure that each juror could indeed disregard the prosecutor's comment. *Stephenson I*, 742 N.E.2d at 484. The trial judge acknowledged that the prosecutor's comment was serious, but concluded that it did not "rise to the level of placing the Defendant in grave peril in light of an appropriate admonishment." *Id.* (quoting R. at 23, 232). The Indiana Supreme Court agreed with the trial judge's conclusion. *Id.*

The second offending comment by the prosecutor occurred during the testimony of State witness Detective Marvin Heilman. On cross-examination, the Petitioner's counsel asked Detective Heilman whether he had discovered any visible means of income or support for various State witnesses. *Id.* at 484. On re-direct, the prosecutor asked Detective Heilman whether he had discovered any visible means of income or support for the Petitioner. *Id.* The Petitioner's counsel objected at that point, accusing the prosecutor of insinuating that the Petitioner must be supporting himself by illegal means. *Id.* The Petitioner moved for a mistrial. *Id.* The trial court denied the motion for a mistrial, but sustained the Petitioner's objection to the prosecutor's question. *Id.* The Indiana Supreme Court found no indication in the record that Detective Heilman ever answered the prosecutor's question in the presence of the jury. *Id.* The Indiana Supreme Court concluded that the prosecutor's question, while inappropriate, "had no probable persuasive effect on the jury's decision." *Id.* Given the volume of evidence heard by the jury

during a trial lasting approximately five months, this Court cannot say that the Indiana Supreme Court's ultimate conclusion was objectively unreasonable. The claim is therefore denied.

Because the Indiana Supreme Court did not unreasonably apply federal law in finding that neither of the Petitioner's claimed errors were really errors, the Court denies the confrontation clause claim, the prosecutorial misconduct claim, and the cumulative error claim.


**F.    Right to Counsel and the Right to be Present**

The Petitioner contends that his Sixth Amendment right to counsel and his Fourteenth Amendment due process right to be heard in a meaningful time and in a meaningful manner were violated when the trial judge, without notifying the parties, summarily denied a jury request to review certain evidence presented at trial. The Indiana Supreme Court rejected the Sixth Amendment claim on state procedural grounds. The Petitioner failed even to cite the Fourteenth Amendment in his brief to the Indiana Supreme Court. The State contends that these claims are barred by procedural default.


**1.    *Sixth Amendment Right to Counsel***

In his brief to the Indiana Supreme Court, the Petitioner asserted that the absence of his counsel when the judge rejected the jury's request to review certain evidence constituted a violation of his Sixth Amendment right to be represented by counsel at all critical stages of the trial. (Pet'r's Appellate Br. 59.) In support, the Petitioner's brief failed to develop the argument beyond merely citing the text of the Sixth Amendment itself. (*Id.*) While the Indiana Supreme Court acknowledged that under state law the trial judge should have informed the parties of the jury's request before responding, it found that the error was harmless because the judge merely

refused the request without comment. *Stephenson I*, 742 N.E.2d at 492 (citing *Pendergrass v. State*, 702 N.E.2d 716, 719–20 (Ind. 1998) (stating that an *ex parte* communication is presumptive error, but where the trial judge merely denies the jury's request, "any inference of prejudice is rebutted and any error deemed harmless") (quoting *Bouye v. State*, 699 N.E.2d 620, 628 (Ind. 1998))). This finding of harmless error was based in state law, as the Indiana Supreme Court treated the Petitioner's federal Sixth Amendment claim as waived due to failure to properly present the issue, citing Indiana's then-Rule of Appellate Procedure 8.3(A)(7).[7] *Stephenson I*, 742 N.E.2d at 493.

Nevertheless, as an alternative ground for rejecting the federal claims, the Indiana Supreme Court cited *Pendergrass* for a discussion of the right to be present under the Sixth and Fourteenth Amendments. *Id.*, citing *Pendergrass*, 702 N.E.2d at 718–19, n.3. This discussion points out that "the Confrontation Clause of the Sixth Amendment extends to situations related to the presentation of witnesses or evidence, when the right of cross-examination is implicated." *Pendergrass*, 702 N.E.2d at 718–19, n.3 (citing *Kentucky v. Stincer*, 482 U.S. 730, 737–38 (1987)). The Indiana Supreme Court also noted in *Pendergrass* that "[u]nder the Due Process Clause of the Fourteenth Amendment, 'a defendant is guaranteed the right to be present at any stage of the criminal proceedings that is critical to its outcome if his presence would contribute to

---

[7] The Indiana Rules of Appellate Procedure were changed in 2001. The applicable rule at the time of the Petitioner's appeal provided in relevant part:

**Rule 8.3. Arrangement and Contents of Briefs**

**(A) Brief of Appellant.** The brief of Appellant shall contain under appropriate headings and in the order listed here. . .

(7) An Argument. Each error that appellant intends to raise on appeal shall be set forth specifically and followed by the argument applicable thereto. . .The argument shall contain the contentions of the appellant with respect to the issues presented, the reasons in support of the contentions along with citations to the authorities, statutes, and parts of the record relied upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts of the case under review.

the fairness of the procedure.'" *Pendergrass*, 702 N.E.2d at 718–19 (quoting *Stincer*, 482 U.S. at 745).

The Court is limited to determining whether the application of the state rule in this case violated this Petitioner's federal constitutional right to due process of law. The Indiana Supreme Court determined that the Petitioner failed to make clear in his brief the legal basis for his federal Sixth Amendment right to counsel claim. But even if the Indiana Supreme Court should have entertained the federal arguments on the merits, the Petitioner's Sixth Amendment rights were not violated, and for essentially the same reasons the Indiana Supreme Court gave for rejecting the Petitioner's parallel state law claim under Article I § 13 of the Indiana Constitution. Even though it was error under federal as well as state law for the trial judge not to inform and hear from the defense before responding to the jury's request, the judge simply rejected the request without further comment. There was no evidence presented to the jury through the trial judge's response to the jury's request. No testimony was heard that might have been challenged through cross-examination. There was nothing in the judge's response to the jury request that could have unduly influenced the jury's deliberation. On collateral review the burden is on the Petitioner to show that the trial court's failure to notify the parties before rejecting the jury's request had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38. The Petitioner has not met this burden.

### 2.    *Fourteenth Amendment Right to Be Heard*

Before this Court, the Petitioner cites *Gardner v. Florida*, 430 U.S. 349 (1977), for the general proposition that a defendant has a Fourteenth Amendment due process right to be heard in a meaningful time and in a meaningful manner. However, the Petitioner did not cite either

*Gardner* or the Fourteenth Amendment itself in his brief to the Indiana Supreme Court. He may not do so for the first time now. This claim is therefore procedurally defaulted for failure to fairly present it to the state courts. The Petitioner did not even cite the Fourteenth Amendment in the relevant section of his brief to the Indiana Supreme Court, much less comply with the applicable state procedural rules for properly supporting an argument in an appellate brief. In addition, as with the Petitioner's Sixth Amendment right to counsel argument, the burden on collateral review is on the Petitioner to prove any error was not harmless. And as with the Sixth Amendment right to counsel argument, the Petitioner has not met that burden with respect to this claim.

The Petitioner's Sixth Amendment right to counsel claim and his Fourteenth Amendment right to be heard claim are both barred by procedural default, and even if they were not, any error was harmless. Both claims are therefore denied.


## CONCLUSION

Based on the foregoing, the Court finds that none of the Petitioner's proposed grounds for Habeas relief satisfies the requirements set forth in 28 U.S.C. § 2254. Accordingly, his First Petition for Writ of Habeas Corpus [ECF No. 19] is DENIED.

SO ORDERED on September 30, 2014.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION