# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| JOHN M. STEPHENSON, | ) |  |
|---|---|---|
| Petitioner, | ) |  |
| v. | ) | CAUSE NO.: 3:07-CV-539-TLS |
| RON NEAL, Superintendent of Indiana State Prison,[1] | ) | DEATH PENALTY CASE |
| Respondent. | ) |  |

## OPINION AND ORDER

On September 30, 2014, the Court issued an Opinion and Order [ECF No. 90] denying the Petitioner's First Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus [ECF No. 19]. This matter is now before the Court on the Petitioner's Motion to Alter Judgment pursuant to Federal Rule of Civil Procedure 59(e) [ECF No. 92], filed on October 27, 2014. For the reasons stated in this Opinion and Order, the Court will deny the Petitioner's Motion.

## BACKGROUND

On February 4, 2008, the Petitioner filed his First Petition for Writ of Habeas Corpus [ECF No. 19]; and on September 2, 2008, the Petitioner filed a Motion for Summary Judgment [ECF No. 39]. Following a hearing on March 5, 2009 [ECF No. 49], the Court filed an Opinion and Order [ECF No. 50] on July 1, 2009, granting the Petitioner's Motion for Summary Judgment, and conditionally granting the Great Writ on Ground 1 (ineffective assistance of counsel). The State appealed, and on January 24, 2011, the Seventh Circuit Court of Appeals

---

[1]At the State's request, Ron Neal is substituted for Mark E. Levenhagen as the named party in this case.

filed a Mandate [ECF No. 70] reversing the judgment of this Court and remanding for consideration of the Petitioner's remaining claims. The Petitioner filed a Traverse to and Memorandum in Support of the Habeas Petition [ECF No. 81] on April 3, 2012. The State filed a Response [ECF No. 85] on July 6, 2012; and the Petitioner filed a Sur-reply [ECF No. 86] on September 7, 2012. On September 30, 2014, the Court filed an Opinion and Order [ECF No. 90] denying the Petition for Writ of Habeas Corpus.

The Petitioner filed the instant Motion [ECF No. 92] on October 27, 2014. The Petitioner contends that the Court committed a manifest error of law by denying his freestanding actual innocence claim without holding an evidentiary hearing. The State filed a Response [ECF No. 93] on November 10, 2014, and the Petitioner filed a Reply [ECF No. 94] on November 14, 2014. This matter is fully briefed and ripe for ruling.

## ANALYSIS

Pursuant to Rule 59(e), a court may "alter or amend a judgment only if the petitioner can demonstrate a manifest error of law or present newly discovered evidence." *Obriecht v. Raemisch*, 517 F.3d 489, 493 (7th Cir. 2008). The Seventh Circuit has discussed the role of a motion to reconsider:

> A motion for reconsideration performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court.

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citations omitted). In essence, a motion for reconsideration under Rule 59(e) "calls into question

the correctness of the judgment." *Kladis v. Brezek*, 823 F.2d 1014, 1017 (7th Cir. 1987). However, a Rule 59(e) motion may not be used simply to re-litigate issues that have already been decided. *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 512 (7th Cir. 2007) (quotation marks omitted).

**A.     Freestanding Actual Innocence Claim (Standard of Proof)**

As the Court explained in its Opinion and Order denying habeas relief [ECF No. 90], the United States Supreme Court has only assumed, without deciding, that a freestanding claim of actual innocence is cognizable. *See, e.g., In re Davis*, 557 U.S. 952, 952 (2009); *House v. Bell*, 547 U.S. 518, 555 (2006); *Herrera v. Collins*, 506 U.S. 390, 417–419 (1993). In contrast, the Supreme Court has officially recognized a claim of actual innocence as a "gateway" for excusing procedural default on underlying constitutional claims. *See Schlup v. Delo*, 513 U.S. 298, 327 (1995) (petitioner accompanied his actual innocence claim with an assertion of constitutional error at trial).

Unlike a gateway actual innocence claim, which requires a petitioner to present reliable evidence, not available at trial, demonstrating "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence," *id.* at 327, the Supreme Court has not clearly articulated a standard of proof for a hypothetical, freestanding claim of actual innocence. Speaking only in general terms, the Supreme Court offered the following in *Herrera*:

> [B]ecause of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

3

506 U.S. at 417 (emphasis added); *see also id.* at 419, 426 (O'CONNOR, J., concurring) (when a petitioner has been "tried before a jury of his peers, with the full panoply of protections that our Constitution afford criminal defendants," it is appropriate to apply an "extraordinarily high" standard of review.) In *House*, the Court elaborated on *Herrera*, explaining that "[t]he sequence of the Court's decisions in *Herrera* and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing a gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*." 547 U.S. at 555.

Taking all of this guidance together, this Court determined that, assuming the existence of a freestanding claim of actual innocence, the Petitioner "can succeed only if the totality of the evidence, old and new, clearly shows that the Petitioner is actually innocent of the crime for which he is incarcerated." (Op. & Order 52, Sept. 30, 2014.) In other words, the totality of the evidence must clearly establish the Petitioner's actual innocence by showing that no reasonable juror would have convicted the Petitioner when presented with new evidence. *See Davis*, 557 U.S. at 952 (remanding to the district court to determine whether the petitioner could "clearly establish" his innocence); *Schlup*, 513 U.S. at 329 ("The meaning of actual innocence as formulated by [the Supreme Court] does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty").[2] While a habeas court "may have to make some credibility assessments" in

---

[2] The "no reasonable juror" standard is also used to determine whether sufficient evidence exists to support a conviction. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). However, the threshold showing for a freestanding actual innocence claim is lower than the *Jackson* standard, which prohibits the consideration of any new evidence not presented at trial, because the question is whether any rational trier of fact could have convicted "*upon the record evidence adduced at the trial.*" *Id.* (emphasis added). Here, the Court is free to consider—and in fact, must consider—evidence not presented at trial, and then determine whether a reasonable juror would have convicted the Petitioner in light of the new evidence. *See* Op. & Order 64, Sept. 30, 2014 ("The Court concludes that if a freestanding actual innocence claim is

4

cases where new evidence calls the credibility of trial witnesses into question, *Schlup*, 513 U.S. at 330, it is in context of the jury's broad authority to determine credibility that the court asks whether a reasonable juror would make a particular credibility determination. *Id*. (noting that, because juries observe the demeanor of trial witnesses and courts of appeals do not, "the assessment of the credibility of witnesses is generally beyond the scope of review.").

B.  **Testimony of Chad Adams**

The Petitioner's actual innocence claim is based primarily on the testimony of Chad Adams. Adams did not testify at trial or the postconviction hearing in state court because his existence as a potential witness did not come to the attention of police until after the postconviction trial court had already denied the Petitioner's request for relief. Police learned of Adams when other inmates with whom he had been in jail alerted police that Adams claimed to have knowledge of the murders for which the Petitioner was convicted. At that time, the Petitioner's motion to correct error had already been filed with the postconviction court. That court agreed to delay ruling on the motion to correct error until the new evidence was investigated. Several new witnesses were deposed, and Adams was given a polygraph examination. After reviewing the evidence, the postconviction trial court denied the motion without comment. In its Opinion and Order denying habeas relief, the Court summarized Adams's testimony, which implicates Brian Mossberger as the individual who committed the crime for which the Petitioner stands convicted:

---

cognizable, then the evaluation of such a claim should include any relevant evidence that was not heard by the jury.").

> Adams told police that on the day of the murders, he and [Donald] Goodman had worked on a car together at Mossberger's house. Adams said that around five or six o'clock in the evening, several people arrived for a bonfire party. The Petitioner was among them. . . . Adams said that a truck drove past the house at around 10:30 PM, and that he thought it was a red full-sized pickup truck. Adams said he heard Mossberger say, "I'm going to get that son of a bitch," at which point Mossberger left in his own truck to follow. Adams said he saw the Petitioner walk back to the bonfire after Mossberger left. Adams told police that he and his wife then went to get more beer, and that when they returned, Goodman came out front and said that they needed to leave immediately. Adams said that he went inside to put the beer in the freezer, and that Goodman told him again they needed to leave, and that Mossberger and the Petitioner were in the bathroom. Adams said that he then heard Mossberger say," I got them on Youngblood road." Adams stated that he, his wife, and Goodman all left the party about five minutes later. Adams told police that the Petitioner was at Mossberger's house at all times Adams was there that evening. Adams stated that Goodman came to Adams's home the next day, and that they talked about the previous night. Adams said his wife and his mother were at his house at this time. Adams told police that Goodman said he thought Mossberger had killed someone the previous night, and that Goodman told Adams not to talk about it to anyone. Adams told police that Goodman looked upset and nervous, and that he believes Goodman moved to Michigan to get away from the whole situation. Adams said that fear was what kept Adams silent.

(Opinion & Order 59–60 (citations omitted).)[3]

However, the Court also summarized the testimony of other new witnesses, and noted that such testimony, along with other evidence received at trial, conflicted with Adams's account:

> Adams's testimony conflicts not only with Mossberger's testimony, but also with the Petitioner's own statement to police, and with other new testimony that the Petitioner asks the Court to consider in deciding this claim (most of which, if credited, would tend to implicate [Guy James "Jimmy"] Knight, not Mossberger). For instance, Adams says that Donald Goodman was with him at Mossberger's house on the night of the murders, but Goodman denies that he was there.

---

[3]The polygraph report notes that Adams was asked three specific questions: (1) whether he actually heard Mossberger say he was going after the truck; (2) whether he actually saw Mossberger drive off after the truck; and (3) whether he actually heard Mossberger say that he "got him on Youngblood Road." (Postconviction App. to Pet.'s Br. 764.) Adams answered "yes" to all three questions, to which the polygraph detected "no significant indications of deception" for questions one and two, and "truthful" for question three. (*Id.*).

6

> Goodman also insists he did not go to Adams's house the day after the murders, as Adams and [Carla] Smith testified. Frances Harper was with Adams both on the night of the murders and the next day at Adams's house. She does not recall seeing Goodman either at Mossberger's house on the night of the murders or at Adams's house the next day. In addition, Harper denies ever discussing the events of the night of the murders with anyone, again directly contradicting the testimony of Adams and Smith.[4]

(*Id.* at 66.)

The Court proceeded to deny the Petitioner's freestanding actual innocence claim without holding an evidentiary hearing because it "cannot conclude based on this record that the Petitioner has clearly established his actual innocence." (*Id.* at 67.)

### C. Petitioner's Request for an Evidentiary Hearing

Generally, "'[a] federal evidentiary hearing is required if a habeas petitioner alleges facts which, if proved, would entitle him to relief and the state courts—for reasons beyond the control of the petitioner—never considered the claim in a full and fair hearing.'" *Spreitzer v. Schomig*, 219 F.3d 639, 648 (7th Cir. 2000) (quoting *Porter v. Gramley*, 112 F.3d 1308, 1317 (7th Cir. 1997)); *cf. Porter*, 112 F.3d at 1318 ("[a]n evidentiary hearing is not necessary when the facts essential to consideration of the constitutional issue are already before the court") (quoting *Jeter v. Keohane*, 739 F.2d 257, 257 n. 1 (7th Cir. 1984); *id.* (noting that, on habeas review, the relevant question "is not so much whether a petitioner has had all the trappings of a full evidentiary hearing, but rather whether the petitioner received 'careful consideration and plenary

---

[4]As to Adams's polygraph report, the Court also noted that "'there is simply no consensus that polygraph evidence is reliable' and 'the scientific community remains extremely polarized about the reliability of polygraph techniques.'" (Op. & Order 65 (quoting *United States v. Scheffer*, 523 U.S. 303, 309 (1998))); *id.* ("[The] Seventh Circuit generally leaves the admission or exclusion of polygraph results to the discretion of the district court.") (citing *Unites States v. Lea*, 249 F.3d 632, 638 (7th Cir. 2001).

7

processing of [his claim,] including full opportunity for presentation of the relevant facts.'") (quoting *Blackledge v. Allison*, 431 U.S. 63, 82–83 (1977)).

Here, the Petitioner has presented—and the Court has carefully considered—Adams's sworn deposition testimony, which remains a part of this record. But in his Motion, the Petitioner argues that an evidentiary hearing is necessary for the Court to determine whether Adams's testimony is credible; because if deemed credible, Adams's testimony "creates reasonable doubt as to [the Petitioner's guilt]" and "constitutes clear and convincing evidence of [the Petitioner's] innocence." (Pet.'s Mot. 3.)

Certainly, the Court acknowledges that an evidentiary hearing would permit an assessment of Adams's credibility through direct observation; and that, generally, the observation of live testimony is more advantageous than reading a transcript when it comes to assessing a witness's credibility. Moreover, Adams's testimony—which is not inherently implausible—may be deemed credible by either the Court or a reasonable juror. But notwithstanding, the Petitioner's "extraordinarily high" burden for establishing a freestanding actual innocence claim cannot be met by a showing that Adams's testimony is credible, or that his testimony may create reasonable doubt in the mind of a reasonable juror. *Schlup*, 513 U.S. at 329; *cf. Herrera*, 506 U.S. at 399 ("Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."). The Petitioner's burden can only be met by a showing that *no reasonable juror* would have chosen to convict him when presented with the new evidence. As previously articulated by the Court, the totality of the evidence—including Adam's testimony, which is contradicted by evidence received at trial (i.e., Mossberger's testimony, the Petitioner's statements to police) and new

evidence received after trial (Goodman's testimony, Harper's testimony)—provides no basis for the Court to declare that a juror would be acting unreasonably by convicting the Petitioner.

> Here, new testimony conflicts with old testimony, and new testimony conflicts with other new testimony, and both old and new testimony conflict with the Petitioner's own statement to police. Attempting to reweigh this jumble of conflicting testimony would be a futile endeavor, the result of which would at best be no more reliable than the result of the original trial.

(Op. & Order 67.); *see Schlup*, 513 U.S. at 329 ("It is not the district court's independent judgment as to whether reasonable doubt exists that the standard [for assessing claims of actual innocence] addresses.").

Contrary to the Petitioner's assertion, this case is also readily distinguishable from *Davis*, in which the United States Supreme Court transferred a state capital prisoner's original habeas petition to the district court for an evidentiary hearing to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence." 557 U.S. at 952. Justice Stevens, joined by Justices Breyer and Ginsburg, stated that an evidentiary hearing was necessary because the petitioner's case presented exceptional circumstances; namely, a total of "seven of the State's key witnesses [had] recanted their trial testimony" and "[a] score of postconviction affidavits" had not been assessed for reliability in state or federal court. *Id.* at 953 (Stevens, J., concurring) (brackets omitted). Justice Stevens went on to proclaim that the new evidence, "if reliable, would satisfy the threshold showing for a truly persuasive demonstration of actual innocence." *Id.* (citation and internal quotation marks omitted); *see also United States v. Davis*, 565 F.3d 810, 827 (11th Cir. 2009) (noting, in part, that an evidentiary hearing is necessary because a "majority of the [new] affidavits support the defense's theory" presented at trial) (Barkett, J., dissenting). Unlike *Davis*,

the Petitioner's case involves no recantations of testimony and just one new exculpatory witness—a witness who, again, submitted testimony that conflicts with numerous pieces of evidence in the record, including the Petitioner's own statement to police and other new testimony that the Petitioner asks the Court to consider in deciding his habeas petition.

The Petitioner also appears to suggest that the Court denied his actual innocence claim without holding an evidentiary hearing because "conflicts in the evidence would make ascertaining Adams's credibility too difficult." (Pet.'s Mot. 3 (internal quotation marks omitted)). This suggestion is incorrect. The futility of the Petitioner's actual innocence claim is not due to any difficulty the Court may face in making a credibility determination. In fact, the Court agrees with the Petitioner that the evidence the district court was ordered to review in *Davis* was "significantly more . . . complicated" than the evidence the Petitioner has presented on habeas review. (*Id.* at 6.) Again, the futility of the Petitioner's actual innocence claim is due to the "extraordinarily high" threshold required for a freestanding actual innocence claim, *Herrera*, 506 U.S. at 417, and the Court's determination that, given the totality of the evidence, the Petitioner cannot clearly establish his actual innocence—with or without an evidentiary hearing. The Petitioner has not pointed to any case law requiring the Court to conduct a hearing under such circumstances.

In sum, because the Petitioner has not demonstrated that the Court's rationale for denying his freestanding claim of actual innocence without holding an evidentiary hearing constituted an error of law—let alone a "manifest error of law," *Obriecht*, 517 F.3d at 493—the Petitioner's Motion to Alter or Amend Judgment pursuant to Federal Rule of Civil Procedure 59(e) [ECF No. 92] is DENIED.

SO ORDERED on January 14, 2016.

                                              s/ Theresa L. Springmann
                                          THERESA L. SPRINGMANN
                                          UNITED STATES DISTRICT COURT
                                          FORT WAYNE DIVISION